CARL L. DANIELSON AND PAULINE S. DANIELSON, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1779–63, 5489–63, 344–64, 473–64. Filed July 12, 1965.

*Sidney B. Gambill* and *Linn V. Phillips, Jr.,* for the petitioners. *Hobart Richey,* for the respondent.

DAWSON, *Judge:* Respondent determined the following deficiencies in petitioners' income taxes for the year 1959:

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 1779–63 | Carl L. and Pauline Danielson | $12,016.88 |
| 5489–63 | Helen P. Sherman | 4,625.30 |
| 344–64 | Estate of Jacob F. Schaffner, Deceased, Elizabeth Schaffner and Erwin Marsch, Executors, and Elizabeth Schaffner. | 1,770.96 |
| 473–64 | Hugh E. and Katherine McLennan | 5,001.49 |

In docket No. 5489–63 Helen P. Sherman has claimed in her petition an overpayment in the amount of $2,675.81.

Petitioners sold the stock of their small loan company for $374 per share and the buyer allocated a portion thereof to separate covenants not to compete just prior to the closing. The principal issue is whether the amounts received by the petitioners pursuant to these covenants actually reflect payment for them. A secondary issue relates to the fair market value of the small loan company's stock on June 20, 1958.

FINDINGS OF FACT

Some of the facts were stipulated by the parties and are hereby found accordingly.

Carl L. and Pauline Danielson are husband and wife residing at R.D. 6, Butler, Pa. Helen P. Sherman resides at 203 Filbert Road, Butler, Pa. Hugh E. and Katherine McLennan are husband and wife residing at 308 Castle Shannon Boulevard, Pittsburgh, Pa. Jacob F.

---

[1] The proceedings of the following petitioners are consolidated herewith: Helen P. Sherman, docket No. 5489–63; Estate of Jacob F. Schaffner, Deceased, Elizabeth Schaffner and Erwin Marsch, Executors, and Elizabeth Schaffner, docket No. 344–64; and Hugh E. McLennan and Katherine McLennan, docket No. 473–64.

and Elizabeth Schaffner were husband and wife during 1959, and they resided in Butler, Pa. All of the petitioners kept their books and filed their income tax returns on a calendar year basis for 1959, using the cash receipts and disbursements method of accounting, with the district director of internal revenue at Pittsburgh, Pa.

Jacob F. Schaffner died on October 20, 1964. His executors were substituted as petitioners.

The Butler County Loan Co. (hereafter called Butler Loan), a Pennsylvania corporation, was organized in 1946 by Hugh McLennan and Paul Sherman, the deceased husband of Helen Sherman. The company conducted a small loan business in Butler, Pa., in its own name and engaged in the consumer finance and consumer discount businesses through a subsidiary corporation.

Prior to forming Butler Loan, Paul Sherman had managed another loan office in Butler, Pa. Because of his experience and ability Sherman developed Butler Loan into a successful business before his death on June 20, 1958.

After Sherman's death, the stockholders called upon Alvin C. Shukis to evaluate the business. Shukis had known Sherman for many years and was then managing a loan company in Oakmont, Pa. Shukis analyzed the accounts of Butler Loan, determined that its stock had a book value of $225 per share, and concluded that it was in a healthy position and should be kept in operation. The petitioners offered the position of manager at Butler Loan to Shukis and he accepted. He received an annual salary of $8,400 plus the option to buy 100 shares of the company's stock over a 5-year period at the then book value of $225 per share. Shukis began his employment with Butler Loan on July 2, 1958.

On December 10, 1958, Butler Loan purchased the 114 outstanding shares of a stockholder who had died. The company paid $226 per share for the stock and held it in the treasury. On September 9, 1959, Shukis exercised his option to buy 10 shares of Butler Loan's stock at $225 per share. After he did so, the stock of Butler Loan was then held as follows:

| Stockholders | Shares |
|---|---|
| Carl L. and Pauline Danielson | 244 |
| Helen P. Sherman | 194 |
| Hugh E. and Katherine McLennan | 148 |
| Jacob F. Schaffner | 90 |
| Alvin C. Shukis | 10 |
| Total | 686 |

Carl Danielson is a physician, specializing in surgery in Butler. He has been engaged in his profession since 1931. Throughout 1959

he actively pursued his medical practice. His wife Pauline was not employed.

Helen P. Sherman is a widowed housewife who devoted her time in 1959 to maintaining her home and raising her three children.

Hugh McLennan has been in the real estate and insurance business for many years in Pittsburgh. During 1959 he actively conducted his business. His wife Katherine devoted her time to their home.

Jacob F. Schaffner was a 93-year-old retired businessman in 1959 who spent his entire time at home. His wife Elizabeth handled almost all of his affairs. He maintained no active participation in any business activities, although he did attend the meetings of Butler Loan's board of directors.

On October 23, 1959, the stockholders of Butler Loan put the business up for sale by soliciting offers from other small loan companies.

Thrift Investment Corp. (hereafter called Thrift) conducts small loan, sales finance, and consumer discount businesses in a number of branch offices. At the time Butler Loan was offered for sale, Thrift already had a branch office operating in Butler. When Thrift's officials learned that the stockholders of Butler Loan wanted to sell, Thrift sent its representatives to examine the outstanding receivables. Based on its analysis, Thrift submitted three alternative bids which were considered, along with those received from other prospective buyers, at a meeting of Butler Loan's stockholders and directors on November 3, 1959. The Thrift offers were contained in the following letter written by Paul M. Hickox, executive vice president, to Hugh McLennan:

> We are pleased to submit an offer of $374 per share cash in consideration for all of the common stock of the Butler County Loan Company and our usual non-compete agreement in the Butler area.
>
> While we prefer to make a cash purchase, we are willing to make an alternative offer of 24 shares of Thrift Investment Corporation common stock (available over-the-counter currently at $9.25 per share) and $152 cash. We believe that this alternative method would avoid capital gains taxes on that part of the consideration paid in stock, if all shareholders accept the alternative plan.
>
> In the event that you wish to sell the assets of the company instead of its capital stock, we would be willing to pay $336,791 for the small loan receivables, net book value for the furniture and fixtures, and net book value for the consumer discount and sales finance receivables after deducting unearned discount. We would also assume the remainder of your lease.
>
> We appreciate the opportunity to submit this offer and are prepared to close this transaction immediately.

Thrift based its offer of $374 per share upon the assumption that by combining Butler Loan's business with Thrift's then-existing branch office in Butler, it could anticipate increased profits of $19,900. Thrift determined that it would need a return of 3 percent on Butler Loan's

outstanding receivables so as not to dilute its existing holdings. The excess earnings were then computed in the following manner:

| | | |
|---|---:|---:|
| Estimated annual profit from acquisition | | $19, 900 |
| Less 3 percent return on outstanding receivables purchased: | | |
| Small loans receivables | $264, 000 | |
| Consumer discount loans | 57, 000 | |
| Sales finance loans | 9, 000 | |
| Total outstanding receivables | 330, 000 | |
| 3 percent of $330,000 | | 9, 900 |
| Excess earnings | | 10, 000 |

Thrift decided to offer the stockholders of Butler Loan the book value of its assets plus 6 times excess earnings as an inducement to sell. This sum ($60,000) was divided by 55 percent to reflect the tax effects which would accrue to Thrift if the amount were amortizable by them.[2]

When the shareholders decided to accept the first of Thrift's alternate proposals, Shukis announced that he would exercise his option to purchase the 90 additional shares allotted him in his employment contract. The remaining shareholders refused to honor the exercise of his option and notified Thrift that they were ready to sell.

On the same day Thrift learned that Butler Loan had accepted its offer. Thrift received a telegram from Shukis stating that he was exercising his option to buy the 90 shares.

On November 5, 1959, Butler Loan received copies of the proposed sales agreement and covenant not to compete. These documents were silent as to any allocation of purchase price between the stock and the covenant not to compete. At a special meeting of the board of directors of Butler Loan, held on the evening of November 5, 1959, Shukis was discharged as manager.

The covenant not to compete contained the same language for each shareholder. It provided that:

Now, THEREFORE, in consideration of the mutual promises and covenants contained herein, and intending to be legally bound hereby, the parties hereto agree as follows:

1. For a period commencing with the date of this agreement and ending November 1, 1965, the Stockholder shall refrain from engaging in the small loan business, and from entering the employ of any person, firm or corporation engaged in any such businesses in the City of Butler or in an area within fifteen miles from the City of Butler. In consideration therefor, Thrift agrees to pay to the Stockholder the sum of * * * payable forthwith upon the execution of this agreement.

---

P $60,000 ÷ 55% = $109,000. An official of Thrift testified that it was that company's policy to offer slightly less than the maximum amount in initial negotiations.

2. The prohibition above provided shall not be deemed to inhibit the Stockholder from owning the capital stock of, making loans to or being a director of any small loan corporation; it shall, however, inhibit the Stockholder from in any manner whatsoever soliciting any small loan, consumer discount or sales finance business in said territory, from being employed at or in the business office of any small loan corporation in said territory, from actively participating in the management or policies thereof and from divulging to any person, firm or corporation other than Thrift, subsidiaries of Thrift and their officers and employees the names or addresses of past or present customers of Butler or any company owned by it.

Although Shukis' claim for 90 additional shares was still outstanding, the remaining stockholders of Butler Loan arranged for a closing with Thrift in the latter's home offices in Pittsburgh, Pa., on November 16, 1959. On that day the balance sheet of Butler Loan was as follows:

### ASSETS

| | | |
|---|---:|---:|
| Cash | | $24, 113. 69 |
| Receivables: | | |
| Small loans (net) | $246, 467. 50 | |
| Notes | 7, 700. 00 | |
| | | 254, 167. 50 |
| Prepaid expenses | | 229. 82 |
| Furniture and fixtures | | 931. 27 |
| Butler County finance service | | 300. 00 |
| Butler County Consumer Discount Co. | | 52, 000. 00 |
| | | 331, 742. 28 |

### LIABILITIES AND EQUITY

| | |
|---|---:|
| Notes payable | 154, 000. 00 |
| Accrued taxes | 325. 90 |
| Miscellaneous liabilities | 7, 310. 13 |
| Common stock | 1, 000. 00 |
| Retained earnings | 169, 106. 25 |
| | 331, 742. 28 |

When they met, the petitioners were located in one room of Thrift's offices with their attorney, Linn Phillips, while Shukis and his attorney occupied another room. The officers of Thrift made it clear to the petitioners that Thrift's price was fixed, and that the cost of issuing any additional shares to Shukis would be borne by the remaining stockholders. Since Thrift was a disinterested party in the dispute between Shukis and the petitioners, it did not participate in the negotiations which followed.

Throughout the afternoon the shareholders of Butler Loan attempted to reconcile their differences. Late in the day Shukis finally agreed to accept $10,153.21 of the total purchase price to be paid by

Thrift for his 10 shares of outstanding stock *and* his claim for 90 additional shares, by executing an agreement which provided in part:

KNOW ALL MEN BY THESE PRESENTS that I, Alvin C. Shukis, 222 Muntz Avenue, Butler, Pennsylvania for myself, executors, administrators and assigns do hereby acknowledge receipt of the sum of $10,153.21 from Butler County Loan Company and Carl L. Danielson, H. Pauline Danielson, H. C. McLennan, Kathryn [sic] E. [McLennan], Helen Sherman and Jacob F. Schaffner stockholders and directors of Butler County Loan Company. This payment is in full settlement of all claims and demands of the said Alvin C. Shukis against Butler County Loan Company, its successors and assigns and said stockholders and directors, their executors, administrators and assigns.

In consideration of the payment of the same the said Alvin C. Shukis, for himself, his executors, administrators and assigns hereby releases and discharges Butler County Loan Company, its successors and assigns and said stockholders, and directors their executors, administrators and assigns from any and all liability to him arising either from his employment as Manager of the Butler County Loan Company and all matters incident thereto including the right to purchase capital stock of the Butler County Loan Company, or any other reason.

The $10,153.21 price was reached by giving Shukis the following:

| | |
|---|---:|
| 10 shares issued in his name | $3,567.20 |
| 100 percent profit on 10 additional shares | 1,317.20 |
| 50 percent profit on 80 remaining shares | 5,268.81 |
| | [3] 10,153.21 |

Petitioners then notified Thrift that they were ready to proceed with the closing. Without any prior notification or discussion with petitioners, Thrift had unilaterally decided to allocate roughly $152 of the purchase price per share to the covenant not to compete and the remaining $222 to the stock. This decision had been made before submission of the bids to Butler Loan on November 3, 1959, but no mention of the proposed allocation was made at that time to the petitioners or to Shukis.

Shukis executed the sales contract for his 10 shares and the covenant not to compete while still separated from the petitioners. The amount of $7,924 was allocated to his covenant not to compete and $2,229.21 to the sales agreement. Shukis had held his 10 shares of stock for less than 6 months, and in no event could he expect capital gains treatment on any portion of his profit. After briefly discussing the provisions of the documents with Thrift's officials, Shukis signed them and left Thrift's offices.

---

[3] It would have cost Shukis $20,250 to exercise his option to purchase 90 shares (90 × $225 = $20,250). This $20,250, added to the $256,564 offered by Thrift ($374 × 686 shares) equals $276,814. But this would increase the number of shares outstanding by 90 shares, from 686 to 776. $276,814 divided by 776 shares equals $356.72 per share. Thus, Shukis' profit would have been $131.72 per share ($356.72 − $225 = $131.72).

Thrift then allocated the following amounts to petitioners' respective covenants not to compete:

| | |
|---|---|
| Carl L. and Pauline Danielson | $34,569.73 |
| Hugh E. and Katherine McLennan | 20,968.52 |
| Jacob F. Schaffner | 12,751.13 |
| Helen P. Sherman [4] | 27,485.76 |

Thrift presented the covenants and sales agreement to the petitioners for signature. When they questioned the unexpected and large amounts allocated to the covenants not to compete, Thrift officials explained that the allocations were to Thrift's tax advantage. The Thrift officials did not tell the petitioners that they would receive capital gains treatment on the amounts allocated to the covenants, and Thrift also made no attempt to explain to the petitioners that these amounts would be taxable to them as ordinary income. At the conclusion of a brief discussion of the allocation, Phillips, their attorney, advised the petitioners to sign the documents. The petitioners then received Thrift's checks which bore the following notation: "Consideration for Capital Stock and agreement not to compete—Butler County Loan Company."

Petitioners reported the entire amount received by them as proceeds from the sale of capital assets. Respondent disallowed that portion which corresponded to the amount allocated to the covenants not to compete.

### ULTIMATE FINDINGS

1. The amounts allocated to the covenants signed by the petitioners were in substance a part of the purchase price paid by Thrift for the stock of Butler Loan.

2. The fair market value of Butler Loan's stock on June 20, 1958, was $226 per share.

### OPINION

The key issue in this case involves the allocation of part of the purchase price received by petitioners to covenants signed by them not to compete. Respondent vigorously urges us to adopt a "new rule" of law concerning the treatment of such written covenants. The proposed "rule" would prevent either contracting party thereto *or* the respondent from subsequently attacking the stated consideration in such agreements unless fraud, duress, or undue influence existed at the time they were signed. Petitioners, on the other hand, contend that the amounts assigned to the covenants do not reflect the real agreement of the parties.

We are unwilling to abdicate our judicial responsibility of examining the substance of a transaction. We are not bound by its form.

---

[4] Helen Sherman did not execute the covenant not to compete, but she received payment in full by a check which stated that both the stock and her covenant were being purchased.

*Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945) ; and *Gregory* v. *Helvering*, 293 U.S. 465 (1935). We are under no obligation to restrict ourselves to the written documents evidencing covenants not to compete, which, of course, would prevent us from arriving at a decision based on all the pertinent facts. It is true, however, that we do not view written agreements lightly, and our decisions generally reflect an adherence to this principle. See *Ullman* v. *Commissioner*, 264 F. 2d 305, 308 (C.A. 2, 1959), affirming 29 T.C. 129 (1957), where is was said that—

when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, *strong proof* must be adduced by them in order to overcome that declaration. * * * [Emphasis supplied.]

See also *Clarence Clark Hamlin Trust*, 19 T.C. 718 (1953), affirmed sub nom. *Hamlin's Trust* v. *Commissioner*, 209 F. 2d 761 (C.A. 10, 1954) ; *Emmette L. Barran*, 39 T.C. 515 (1962), affd. 334 F. 2d 58 (C.A. 5, 1964) ; *Fred Montesi*, 40 T.C. 511 (1963), affd. 340 F. 2d 97 (C.A. 6, 1965) ; and *Rogers* v. *United States*, 290 F. 2d 501 (C.A. 9, 1961).

Upon the entire record, after carefully considering all of the relevant facts of this transaction, we have reached the conclusion that the petitioners have presented the "strong proof" necessary to establish that the allocations of purchase price to the covenants do not reflect the substance of the agreement entered into by the parties.

The standard to be used in making such a factual determination was reiterated recently in *Schulz* v. *Commissioner*, 294 F. 2d 52, 55 (C.A. 9, 1961), affirming 34 T.C. 235 (1960) :

the covenant must have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement.

Under these circumstances we are satisfied that the covenants here involved have no "independent basis in fact" or "arguable relationship with business reality." There is nothing in the covenants which could prevent the petitioners, at any time after the sale of Butler Loan, from establishing a small loan company to duplicate, for all practical purposes, the business they sold. The petitioners were left entirely free to incorporate a new entity, own all its stock, elect themselves as its board of directors and, by the simple means of employing office personnel, conduct a small loan business essentially the same as Butler Loan's.

Aside from the language contained in the covenants, there are other factors that point to the lack of "independent basis in fact." The agreements signed by Shukis recited consideration of $7,924 for his covenant not to compete. Yet to Thrift, Shukis represented a selling stockholder owning only 10 shares. Using Thrift's alloca-

tion of purchase price, Shukis should have received roughly $2,220 for his stock and $1,540 for his covenant not to compete. The additional $6,393.21 he received did not represent consideration paid by Thrift as the result of an arm's-length agreement with Shukis, but rather a settlement amount paid by the petitioners to Shukis for his option to purchase additional shares. As to this sum, Thrift was merely a conduit, acting under the direction of the petitioners. Thrift's allocation of this amount to the covenant indicates the extent to which the parties allowed the form of the agreement to govern its substance.

It is also significant to note the manner in which Thrift arrived at the amount it allocated to the covenants. Thrift ignored entirely the usual ingredients of noncompetition, such as age, previous experience, and likelihood of continued activity in the area. When the agreements were executed, one of the petitioners was a 93-year-old retired businessman who rarely left his home and whose affairs were conducted by his wife. Of the remaining petitioners, three were housewives with no knowledge of the small loan business. Only McLennan and Danielson remain. McLennan was in real estate and insurance work, residing and doing business some 60 miles beyond the area covered in the covenant. Danielson was a busy and successful surgeon. Neither of these men wanted to compete with Thrift in the small loan business in Butler again. But, even assuming their desire to do so, such competition would have obviously taken the form, used by them in Butler Loan, of being stockholders and directors. As previously pointed out, the covenants did not prevent any such threat of competition.

Finally, the sole criterion used by Thrift for determining the amount it would pay for Butler Loan's stock in excess of book value was a capitalization of "excess profits." No attempt was made to evaluate the relative importance of each stockholder as a competitive threat. No separate negotiations surrounding the covenants were ever conducted. Petitioners were at all times under the impression that they were selling the corporate assets of Butler Loan for $374 per share and that their respective covenants not to compete were mere formal assurances required by Thrift which had no real significance. For its part, Thrift intended to purchase the receivables of Butler Loan. It merely calculated the premium it would pay for such a purchase and then unilaterally attempted to change the tax treatment by calling the payment a covenant not to compete.

In *Schulz* v. *Commissioner, supra*, the partners operating a tool-manufacturing business desired to terminate the partnership so that one of them could enter a less risky business venture. The selling partner offered to sell his interest for $109,000 ($91,000 for assets and $18,000 for goodwill); the remaining partners, after meeting

privately with their attorney, suggested the allocation of the $18,000 to a covenant not to compete rather than goodwill. The covenant prohibited competition for 1 year within a 1-mile radius of the existing business. The seller, ignorant of the tax consequences, executed a separate covenant with the stated consideration of $18,000. The seller did not have sufficient knowledge to compete with the partnership, and he was able to prove that he had no desire to do so. It was also established that, because of wartime shortages, the seller could not have reentered the field within the restricted time even if he had wanted to. On those facts we held that the agreement did not accurately reflect the intentions of the parties because the covenant purchased no real advantage for the buyers. It was in reality an attempt to transfer the goodwill of the business under another name.

Our decision here is essentially one of fact. Consequently, a prolonged discussion of the many cases in this area would only serve to point out their factual differences. Suffice it to say that the facts in the *Schulz* case are sufficiently close to the facts of this case to tip the judicial scales in petitioners' favor. In our opinion the covenants not to compete were not realistically bargained for by the parties. Accordingly, we hold that the amounts allocated by Thrift to the covenants not to compete were in reality that part of the purchase price of the stock representing a premium on corporate receivables.

The second issue concerns the fair market value of Butler Loan's stock on June 20, 1958. On that date Helen Sherman acquired her stock in Butler Loan by reason of her husband's death. Section 1014, I.R.C. 1954,[5] provides that the basis of stock so received is its fair market value on that date.

In her 1959 Federal income tax return Helen Sherman reported a gain on the sale of her 194 shares of Butler Loan stock, using $226 per share as her basis. Respondent accepted this basis as correct. However, she claims in her petition that the basis of the stock sold by her in 1959 was $363.47 per share.

The value of stock at any particular time is a question of fact. After considering various valuations placed on the stock, the financial reports of Butler Loan, its record of earnings, the nature of the small loan business, and the prevailing practice of purchasing outstanding receivables at a premium when the business is sold, we have concluded that on June 20, 1958, the fair market value of such stock was $226 per share.

*Decisions will be entered under Rule 50.*

---

[5] SEC. 1014. BASIS OF PROPERTY ACQUIRED FROM A DECEDENT.

(a) IN GENERAL.—Except as otherwise provided in this section, the basis of property in the hands of a person acquiring the property from a decedent or to whom the property passed from a decedent shall, if not sold, exchanged, or otherwise disposed of before the decedent's death by such person, be the fair market value of the property at the date of the decedent's death * * *.