Jack Ziegelheim and Minnie Ziegelheim v. Commissioner.
Ziegelheim v. Commissioner
Docket No. 1726-65.
United States Tax Court
T.C. Memo 1967-87; 1967 Tax Ct. Memo LEXIS 170; 26 T.C.M. (CCH) 431; T.C.M. (RIA) 67087; April 25, 1967
Seymour Reitknecht, 275 Madison Ave., New York, N. Y., for the petitioners. Leon M. Kerry and Julian Block, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: The respondent determined a deficiency in petitioners' income tax for the year 1960 in the amount of $1,516.11. The only issue remaining is whether a $7,500 payment made to the petitioners in 1960 constituted ordinary income to them. Findings of Fact The petitioners, individual taxpayers, residing in New York City, filed a joint return for the year 1960 with the district director of *171 internal revenue, Manhattan, New York. Minnie Ziegelheim is a party petitioner only because she and Jack Ziegelheim filed a joint return, consequently he is sometimes referred to herein as petitioner or as Ziegelheim. On May 9, 1952, petitioner entered into a shareholders' agreement which gave him the ownership of 20 percent of the outstanding stock of the Bronx Paper Products Co., Inc., (hereinafter referred to as Bronx Paper). The company was in the business of jobbing paper products to retail customers throughout the local metropolitan area of the city of New York. Under the terms of the agreement petitioner was an officer of the corporation and in addition he sold paper products to retail customers as one of its salesmen. On March 11, 1960, after about two months of negotiation, and in the presence of his attorney, petitioner signed two documents. The first was an agreement between all the shareholders and Bronx Paper, which called for petitioner to transfer his entire interest in Bronx Paper to that corporation in return for $45,220.56. The sum was to be paid to petitioner over a period of approximately two years, and he testified, and we find, that such sum was arrived at *172 by the contracting parties as equalling the book value of petitioner's share of the total capital of Bronx Paper as of November 30, 1959, as shown by a financial statement prepared by the firm of Gottlieb and Hurst, certified public accountants. The agreement also required the corporation to transfer to petitioner a list of certain customers which were to be his exclusively. These customers had originally been his before he became associated with Bronx Paper. The agreement provided further that neither that corporation nor the other directors could call upon or do business with those customers on the list with respect to the sale of paper, paper products and sundry items of the same type. On his 1960 Federal income tax return petitioner showed $45,045.56 on Schedule D as the sales price resulting from the sale of a capital asset (Bronx Paper stock) held more than six months. Petitioner has now stipulated that the amount shown on Schedule D should have been the amount actually received, $45,270.56 (actually $50 more than called for by the agreement). The second document signed by petitioner on March 11, 1960, is in the form of a three-year covenant not to compete with Bronx Paper *173 for the business of the customers of Bronx Paper who were not on the list of customers transferred to Ziegelheim. It is reproduced in the footnote. [1]
*174 Ziegelheim acknowledged the receipt of the $7,500 consideration recited in the agreement, however, he did not report such receipt on his return for 1960. Bronx Paper properly filed its income tax return under Subchapter S of the I.R.C. (section 1371 et seq.) [2] for its year ended November 30, 1959. On such return petitioner's 20 percent share of undistributed taxable income was properly shown as $6,346.45. Petitioner properly reported such amount as ordinary income on his 1959 return even though it was not distributed to him. The accounting firm of Gottlieb and Hurst audited Bronx Paper's financial position in November 30, 1959. It properly showed the corporation's total capital to be $221,652.82 which figure included the corporation's undistributed November 30, 1959, profit of $31,732.26 and therefore also included petitioner's undistributed 1959 taxable income of $6,346.45. Opinion Respondent has determined that the entire $7,500 received was consideration for a covenant not to compete, arguing that any tax consequences resulting from the receipt are to be controlled by the recitals *175 in the agreement. Petitioner argues that the $7,500 payment was actually a further payment for the stock sold back to the corporation by him. He alleges that the covenant not to compete was not usual or necessary in the type of business conducted by Bronx Paper, because there was a custom in the trade of not knowingly soliciting business of competitors. He further argues that the true value of the covenant was considerably less than the $7,500 recited in the agreement. The evidence presented by the petitioner does not establish either the strict business practice of not calling upon another's customers nor the excessive character of the payment received for the agreement not to compete. Petitioner personally testified that as a salesman he found it very rare for any salesman to call upon a competitor's accounts, however other witnesses who were familiar with trade practices of the paper products business did not confirm the existence of any such custom as a strict general trade practice. Petitioner himself introduced the original shareholder's agreement of May 9, 1952, which provided that in the event of one shareholder withdrawing from the corporation, a covenant not to do business *176 or solicit accounts of the business for a five-year period was to be executed by the withdrawing shareholder. This requirement would appear to anticipate a situation where a former shareholder would not feel bound by a business practice to refrain from calling on company customers. Thus the lack of a definite trade practice plus this evidence of a prior anticipation of a restrictive covenant makes it appear clear that the execution of the covenant not to compete was the result of arm's length bargaining in good faith. Petitioner's contention that the covenant in question was not worth $7,500 appears to be based on two theories. The first suggested is that because the provisions of the agreement would have been adhered to even without the agreement, that having the written agreement is superfluous and thus worthless. As was stated above, the evidence presented as to the existence of a trade practice of not dealing with competitors' customers is insufficient to establish such a practice. Petitioner's second contention is that the agreement not to compete was required to be made at no additional cost to the company under the terms of the previous shareholders' agreement of 1952. He *177 points out that such agreement called for a shareholder who sold his stock back to the corporation to enter into a covenant not to compete similar in form to the one executed by him. But no mention was made in such agreement as to whether additional consideration was to be paid to the shareholder for executing the covenant. In the same 1952 agreement there was a provision which provided that a customer list containing those customers who were the customers of a shareholder before he entered the business were to be returned to the shareholder upon his withdrawal from the corporation at no cost to the withdrawing shareholder. Petitioner reasons that because the company was required to transfer its list of customers for no additional consideration, that the shareholder was expected to execute his covenant not to compete for no additional consideration. But it could also be argued that specifically requiring no consideration to the company, while not mentioning consideration for the covenant not to compete, indicates that the parties left the question of consideration for the covenant open for further negotiations. However, deciding whether or not consideration for the covenant not *178 to compete was contemplated by the 1952 agreement is not necessary here, since petitioner did not show that the original shareholders' agreement controlled the negotiations pertaining to the terms of the documents signed. The agreement introduced into evidence is dated May 9, 1952. Yet the agreement which Ziegelheim entered into on March 11, 1960, providing for the resale of his stock in Bronx Paper, refers to a shareholders' agreement dated May 22, 1959. This later agreement was not put into evidence and we do not know its provisions. But even if that agreement did provide for a covenant not to compete at no additional cost to the company, there is nothing to prevent its parties from eventually agreeing to change its terms. Petitioner has put forth the proposition that the $7,500 figure was actually part of the purchase price of his stock in Bronx Paper and not the consideration for the agreement not to compete. He testified that during the negotiations for the purchase of his interest that he had demanded an additional $7,500 over his approximate $45,000 book value interest in order to receive the true value of his investment. The $7,500 supposedly was derived from two items, one *179 for $6,300 and the other for $1,200. Petitioner argues that the $6,300 amount represents the $6,346.45 which was taxed to him as ordinary income (but not distributed) before he gave up his interest in Bronx Paper. Actually when Ziegelheim received 20 percent of the book value of the capital stock and surplus of Bronx Paper, this $6,300 item in question was included in the amount he received. If, as the petitioner concedes, 20 percent of the net worth of the corporation was paid to him as his representative share of the book value of the corporation, [3] then the $6,346.45 item declared on his 1959 return was fully included in the amount he received. An additional $6,300 was not needed to correct any defects occurring in the books of Bronx Paper due to the reporting of Bronx Paper as a Subchapter S corporation. If Ziegelheim did receive an extra $6,300 because of the Subchapter S situation, he was reimbursed for that amount twice. *180 In addition to the $6,300 item, petitioner states that $1,200 was to be paid to reflect the true value of his interest in a business which Bronx Paper had purchased for more than the value of the business shown as an asset on the books of Bronx Paper. Apparently Ziegleheim is referring to a restrictive covenant which was entered into by Benjamin Weil in return for a specified amount of cash (not disclosed) from Bronx Paper. The cost of the covenant to the corporation appears to have been set up as an asset and then written off over the period of the life of the restrictive covenant. At November 30, 1959, the agreement with Weil was shown as an asset valued at $4,833.31. It was written off in full in 1960. Ziegelheim seems to propose that because he no longer benefited from the covenant entered into by Weil with Bronx Paper that he was entitled to his share of the amount which had previously been deducted as an expense. Apparently Ziegelheim felt that his share of the amount previously deducted was about $1,200. The value of the Weil restrictive covenant may have been in excess of the amount shown on the books of the corporation. However, the agreement was for a fixed period of *181 time and apparently expired the following year (1960). It is difficult to determine how Ziegelheim was able to attribute a greater value to the covenant than was shown on the books of the corporation. He testified that since he was getting no good will, he should get back part of the money which he had paid to the corporation and which the corporation had deducted. [4]
The meaning and logic of the quoted statement are confused. It should be noted, however, that any amounts pertaining to the covenant not to compete had already been paid to Weil. The asset representing the covenant not to compete did not represent any excess cash available for distribution. We observe that no other witness nor any document presented in evidence confirmed petitioner's theory as to the reasons for the $7,500 payment. The explanations given by petitioner are not accurate *182 or logical. Petitioner's evidence is wholly insufficient to convince us that the $7,500 was for any purpose other than consideration for a covenant not to compete. The petitioner has charged that he was defrauded by his former associates. The charge appears to be groundless. The agreement to sell and the covenant not to compete were the culmination of two months of negotiations. Ziegelheim testified that at the time of signing he had relied upon a statement by Irving Gottlieb, the accountant who had prepared both his and Bronx Paper's income tax returns in the past, to the effect that the $7,500 would not be taxable to him. Gottlieb testified that he gave no tax advice whatsoever to Ziegelheim as to how the $7,500 was to be treated. Gottlieb further testified that had he given advice as to the treatment of the $7,500, he would have told Ziegelheim to report the amount as ordinary income. Gottlieb was a financially uninterested party to the negotiations between Ziegelheim and the other shareholders of Bronx Paper. Consequently there is no apparent reason for Gottlieb to have attempted to mislead petitioner. The record shows that Ziegelheim knew exactly what he was signing even *183 if he was ignorant of its tax consequences. As we pointed out in Carl L. Danielson, 44 T.C. 549, 556, the standard to be used in making a factual determination in cases similar to the present one is that cited in Schulz v. Commissioner, 294 F. 2d 52, 55 (C.A. 9, 1961), affirming 34 T.C. 235 (1960): the covenant must have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement. In this case the petitioner executed a covenant which stated that he would not compete with a company for the business of certain customers for a period of three years. As consideration for the covenant, it specified that petitioner receive $7,500. The $7,500 was received by the petitioner when he signed the covenant. Standing alone, the covenant and the $7,500 receipt are strong evidence that the true nature of the transaction was accurately reflected *184 by the recitals in the covenant. Balthrope v. Commissioner, 356 F. 2d 28 (C.A. 5, 1966), affirming a Memorandum Opinion of this Court; Ullman v. Commissioner, 264 F. 2d 305, 308 (C.A. 2, 1959), affirming 29 T.C. 129; Carl L. Danielson, supra, at 556; Annabelle Candy Co. v. Commissioner, 314 F. 2d 1, 7 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court. The circumstances surrounding the execution of the covenant further support the proposition that the $7,500 was actually paid and received for a covenant not to compete. When the covenant was executed, the petitioner was an active salesman who could easily have used his skills to take away customers of Bronx Paper. He represented an economic threat to Bronx Paper and the covenant not to compete alleviated that threat. Cf. Ullman v. Commissioner, supra, at 308. Over the three-year period of the covenant, the consideration breaks down to $2,500 per year, a sum which on its face does not appear to be unreasonable in light of the fiscal 1959 profit of the corporation in the amount of $31,732.26. The petitioner does not contend that any of the *185 amounts received from Bronx Paper were for goodwill. The agreement which called for the sale of Ziegelheim's stock in Bronx Paper compensated Ziegelheim for the full book value of his shares, consequently the $7,500 payment was for some other item than the value of Ziegelheim's stock in Bronx Paper. The logical assumption is that the $7,500 received was for the covenant not to compete. The present case clearly falls within the fact situation in Balthrope v. Commissioner, supra, where one of the petitioners sold his interest in a radio station for $442,000. In a separate agreement, made in order to satisfy the tax planning desires of the purchaser, the petitioner signed a ten-year covenant not to compete and allowed $150,000 of the $442,000 to be allocated to the covenant. At the time of the agreement the minimum estimated value of all assets of the radio station was $442,000, and in addition the petitioner was in poor health and had expressed his desire to permanently retire from the radio business. Despite the evidence of a tax avoidance scheme on the part of the purchaser, the $150,000 received for the covenant not to compete was upheld as the bona fide consideration *186 for the covenant. The court relied in large part upon the fact that the agreement was the result of arm's length negotiation. In the instant case, there is less evidence of conscious tax planning than there was in Balthrope. The total consideration received by Ziegelheim was in excess of the value of the corporation's assets, while Balthrope received an amount about equal to the value of his station's assets exclusive of goodwill. Ziegelheim, like Balthrope, agreed to the terms of the sale of stock and covenant not to compete after a substantial period of negotiation. We uphold respondent's determination that the $7,500 payment received is to be treated as compensation for a covenant not to compete and constitutes ordinary income in 1960. [5]
*187 One point remains in regard to the tax treatment of the amounts received for petitioner's sale of his stock of Bronx Paper and the consideration for the covenant not to compete. Petitioner argues that since he returned $6,346.45 as ordinary income in 1959 when Bronx Paper filed under the Subchapter S provisions, that he is entitled to that amount as a credit against the $7,500 received for the covenant. His position is that paying ordinary income taxes on the full $7,500 amounts to taxation of the $6,346.45 amount twice. The law does not support petitioner's position. Section 1376(a) of the Internal Revenue Code provides that any amounts declared by a taxpayer as ordinary income as a result of a corporation's filing as a Subchapter S corporation are to increase the taxpayer's basis in the corporation by the amount of the income declared. [6] The increase in basis survives a termination of the corporation's election to be taxed as a small business corporation. Section 1372 (b)(2); section 1.1376-1, Income Tax Regs.
*188 On his return for the year 1960, in reporting the sale of his Bronx Paper shares, the petitioner showed a cost basis of $25,000. The respondent correctly increased this by $6,346.45, (petitioner's share of undistributed 1959 taxable income), to $31,346.45 in recomputing petitioner's tax liability. As a result of respondent's adjustment, petitioner was allowed to apply the full amount of the income he reported under the Subchapter S provision against the sales price of his Bronx Paper stock. There was no double taxation. Decision will be entered under Rule 50. Footnotes
1. In consideration of the sum of $7500.00 paid to the undersigned by BRONX PAPER PRODUCTS CO. INC., receipt whereof is hereby acknowledged, the undersigned JACK ZIELGELHEIM covenants to and with the said BRONX PAPER PRODUCTS CO. INC., its successors and assigns, that for a period of three years from the date hereof, he will not directly or indirectly, either as employee, as owner, as partner, as agent, or as a stockholder, director or officer of a corporation or otherwise, call upon or solicit or deal with or do business with any of the customers and accounts appearing on the books of BRONX PAPER PRODUCTS CO. INC. as of this date or within three years from the date hereof except those accounts simultaneously herewith transferred by BRONX PAPER PRODUCTS CO. INC. to the undersigned. The accounts and customers included in this restriction cover both the address of the particular account and the person thereof so that if a customer moves to a new address the restriction will follow him to said new address and will also apply to any person who may succeed the customer at his old address except in the event that the person so succeeding the said customer at his old address is a person included in the schedule of accounts transferred herewith by the BRONX PAPER PRODUCTS CO. INC. to the undersigned. The foregoing restriction applies not only to paper, paper products, paper goods, groceries, housewares, but to any and all other lines of merchandise that the said BRONX PAPER PRODUCTS CO. INC. may handle during the period expiring three years from the date hereof. Dated: March 11, 1960. /s/ Jack Ziegelheim / Jack Ziegelheim Witness [Unreadable]↩
2. All references are to the Internal Revenue Code of 1954.↩
3. It should be noted that though the agreement for resale of Ziegelheim's shares resulted in a payment of $45,270.56 the agreement of March 11, 1960, calls for $45,220.56 while 20 percent of the total capital at November 30, 1959, is $44,330.56. The parties have stipulated that $45,270.56 was the sales price under the agreement and for our purposes we will assume that that amount represents approximately 20 percent of the total capital of Bronx Paper representing payment in full to Ziegelheim for the book value of his stock.↩
4. "My request to them was that inasmuch as the business remains there, I don't get any good will going out of the business, I would like to get part of that money back which I contributed and paid, because it was deducted from the corporation. Otherwise it would be in the corporation, and I would get it at the time I go out."↩
5. The law is clear that the consideration of $7,500 for the covenant not to compete is to be treated as ordinary income. As stated in Mertens, Law of Federal Income Taxation, sec. 22.33 (1966): In binding himself by a covenant not to compete with the promisee of the covenant, the promisor in effect surrenders his right to earn income from a particular form of service, and compensation for refraining to perform services characteristically is as much ordinary income as compensation for the affirmative act of rendition of the services. * * *↩
6. SEC. 1376. ADJUSTMENT TO BASIS OF STOCK OF, AND INDEBTEDNESS OWING, SHAREHOLDERS. (a) Increase in Basis of Stock for Amounts Treated as Dividends. - The basis of a shareholder's stock in an electing small business corporation shall be increased by the amount required to be included in the gross income of such shareholder under section 1373(b), but only to the extent to which such amount is included in his gross income in his return, * * *↩