SUCCESSION OF RICHARD P. BROWN, DECEASED, SUE RAE BROWN, EXECUTRIX, AND SUE RAE BROWN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Succession of Brown v. Commissioner
Docket No. 34256-84.
United States Tax Court
T.C. Memo 1989-133; 1989 Tax Ct. Memo LEXIS 133; 56 T.C.M. (CCH) 1568; T.C.M. (RIA) 89133; March 29, 1989. *133 Petitioner-husband was one of a group of investors which acquired an option to buy a hospital. They acquired the option on April 1. The option was extended to October 9. The optionees needed more time to obtain financing, so they negotiated for more time, agreeing to different terms and a higher consideration. The optionees acquired a "new option", reflecting the negotiations, on October 9. On October 25, the optionees donated their purchase rights to an eligible charitable donee. Held: The optionees donated a second, separate option which they did not hold for more than 6 months. Petitioners' charitable contribution deduction is not to exceed petitioner-husband's basis in the new option. Sec. 170(e)(1)(A), I.R.C. 1954. Reily v. Commissioner,53 T.C. 8 (1969), followed. John A. Stassi, II and June Y. Bass, for the petitioners. Diane D. Helfgott, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax against petitioners as follows: Year
Deficiency
1974
$ 2,144
1975
2,617
1976
1,448
1977
3,086
1978
2,387
The issue for decision is whether petitioners held an option more than 6 months, so as to entitle *134 them to take a charitable contribution deduction based on the fair market value of the option, without being limited by section 170(e)(1)(A). [1] FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioners Richard P. Brown (hereinafter sometimes referred to as "Brown") and Sue Rae Brown, husband and wife, resided in Metairie, Louisiana. After the trial of the instant case, Brown died and his estated was substituted as a petitioner. Sometime before April of 1974, National Medical Care, Inc. (hereinafter sometimes referred to as "National"), the then owner of Saint *135 Charles General Hospital (hereinafter sometimes referred to as "General Hospital") in New Orleans, wanted to get out of the hospital business and concentrate on the kidney dialysis business. Brown worked for National as a consultant until late March, at about which time he became the director of operations at General Hospital. Edward Hager (hereinafter sometimes referred to as "Hager") and Constantine Hampers (hereinafter sometimes referred to as "Hampers"), together representing National, came to New Orleans to find out if the people who were then managing General Hospital would be interested in owning it. On April 1, 1974, Arnold M. Lupin (hereinafter sometimes referred to as "Arnold") and E. Ralph Lupin (hereinafter sometimes referred to as "Ralph") entered into an option (hereinafter sometimes referred to as "the original option") agreement with National. The original option and new option (discussed infra) agreements state that they are between National, and Arnold and Ralph. By "Counter Letter" dated October 9, 1974 (hereinafter sometimes referred to as "the Counter Letter"), Arnold and Ralph agreed that, in entering into the original and the new options, they had acted on *136 behalf of a group of investors, including Brown (hereinafter sometimes collectively referred to as "the optionees"), and that Brown had a 10-percent interest in the options. [2] The money paid to secure the options between National and the optionees was paid by Arnold on behalf of the optionees, and from funds provided by the optionees. The optionees paid $ 500 for the original option; in exchange, National granted to the optionees the right to buy General Hospital for $ 5,200,000. The original option was to expire at midnight, July 1, 1974. Payment was to be in the form of $ 4,800,000 in cash and a promissory note for $ 400,000. The original option provides, in pertinent part, as follows: III. The option herein granted is subject to the following terms and conditions: A. The purchase price of said property is the sum of five million two hundred thousand dollars ($ 5,200,000.00), to be paid by Purchasers to Vendor at *137 the act of sale, as hereinafter set out. B. Unless exercised in the manner hereinafter set forth, this option and all rights and privileges thereof shall expire at twelve o'clock midnight July 1, 1974, or at twelve o'clock midnight of the day to which the option may be extended under the provisions of Article V hereof. Time is of the essence in this Agreement. * * * D. If the Purchasers fail to exercise the option as herein provided * * * this Agreement shall terminate and Purchasers shall have no further rights hereunder. * * * V. This option may be extended by Purchasers for not more than one additional 90-day period by giving evidence satisfactory to the Vendor that adequate financing has been arranged and will be secured by the end of the said additional 90 day extension period, * * * and by paying to Vendor the additional sum of five hundred dollars ($ 500.00), through Edward B. Hager, Agent of Vendor, with the giving of the notice of extension. VI. In the event the option is exercised, Purchasers agree to pay Vendor the aforementioned purchase price at the act of sale * * * in the form of four million eight hundred thousand dollars ($ 4,800,000.00) cash and a promissory note *138 in the amount of four hundred thousand dollars ($ 400,000.00) * * * * * * IX. The Vendor agrees not to sell or offer for sale the above mentioned property during the life of this option or any extension thereof. Purchasers agree not to sell or assign or offer to sell or assign this Agreement, if exercised, to any other party of which Purchasers do not retain a substantial interest and/or control therein. X. This Agreement shall constitute the entire contract between the parties hereto and no modification hereof shall be binding unless endorsed hereon in writing * * * By a "Collateral Agreement" dated June 14, 1974 (hereinafter sometimes referred to as "the Collateral Agreement"), National and the optionees amended the original option agreement. The Collateral Agreement provides, in pertinent part, as follows: (1) the effective date of said OPTION AGREEMENT be changed from the presently stated dated [sic] of "April 1, 1974" to read "April 9, 1974". (2) * * * the stated expiration date of "July 1, 1974" be changed to read "July 9, 1974" * * * It is the express purpose of the parties hereto to modify the original "OPTION AGREEMENT" to reflect a change in the effective date of said OPTION *139 to read "April 9, 1974" with an equivalent change in every other effective date under said OPTION * * *. The Collateral Agreement does not change the wording of article V of the original option agreement that "This option may be extended by Purchasers for not more than one additional 90-day period * * *". The original option provides that, if the optionees want to extend the option, then they have to give satisfactory evidence "that adequate financing has been arranged and will be secured by the end of the said additional 90 day extension period". The Collateral Agreement also modifies the extension provision of the original option by requiring that the purchaser only needs to put forth a "good faith" effort to obtain financing, and states that the changes have been made because of errors in the original option agreement. By a letter to Hager dated June 28, 1974, Arnold and Ralph declare that they are exercising their right under article V of the original option to extend the option period for an additional 90 days. [3] *140 The $ 500 "additional sum" referred to in article V of the original option was paid by a check for an additional $ 500, accompanying the letter. The optionees decided that the prospects for profit from General Hospital were uncertain, that the prevailing interest rates were too high, and that they did not want to incur the cost of financing the purchase themselves. They decided to organize a nonprofit corporation to operate General Hospital and to raise the money for the purchase through the issuance of tax-exempt State bonds. While operating General Hospital on a nonprofit basis, the optionees could maintain significant control over the decision-making although they would not share in the profits. The optionees applied to the Louisiana Public Facilities Authority (hereinafter sometimes referred to as "the Authority"), which had just been organized, for bond financing in September *141 of 1974. The principal underwriter for the issuance of the bonds agreed to buy the bonds and sell them to the public, upon verifying that the option price agreed to was consistent with the appraised value of General Hospital. As of the weekend of October 5, the principal underwriter had not completed the appraisal. The bond issuance required the drafting of voluminous legal documents which were largely complete before October 9. However, the financing was not nailed down until the appraisal was done, and the numbers in the bond agreement needed to be changed to reflect the current appraised value of General Hospital and the prevailing interest rates. (As it turned out, General Hospital was appraised at higher than the $ 5,200,000 purchase price in the original option, although the amount of the appraisal is not clear from the record.) Over the weekend of October 5 and 6, Arnold, Mary, and Brown went to Boston to get more option time. The Lupins asked Mary to come with them to Boston because he was a personal friend of Hager. Time was running out, and the Lupins thought that Mary could get Hager to do them a favor by giving them more option time without increasing the price of *142 General Hospital as much as the appraisal might have warranted. Arnold, Mary, and Brown stayed at Hager's house. On the first evening of their visit, they told Hager that they would need more time to buy General Hospital, and Hager told them that he saw no problem with that. On Sunday morning, they met with Hager, Hampers, and Ed Collins (National's house counsel and secretary). Hampers told them that National wanted an additional $ 100,000 in purchase price and $ 5,000 in option money in exchange for granting the optionees more time. A general agreement was reached, and Arnold, Mary, and Brown returned to New Orleans, with the paperwork to follow. On October 9, the optionees and National entered into an option agreement (hereinafter sometimes referred to as "the new option") which provides, in pertinent part, as follows: WHEREAS, Vendor and Vendees are parties to an Option Agreement dated April 1, 1974, as amended by a Collateral Agreement dated June 14, 1974 (the "Option Agreement") providing for the grant by Vendor to Vendees of an option to purchase certain real and personal property as set forth in the Option Agreement for a purchase price of Five Million, Two Hundred Thousand *143 Dollars ($ 5,200,000.00) (the "Old Option"), such Old Option to be exercisable by Vendees during a period which commenced April 9, 1974 and terminates, as extended by Vendees pursuant to article V of the Option Agreement, at midnight E.D.T. on October 9, 1974; [see n.3, supra] and WHEREAS, Vendor and Vendees desire to provide for the grant of a new option upon the expiration of the Old Option; NOW, THEREFORE, the parties hereto agree as follows: 1. Grant of Option
In consideration of the sum of Five Thousand Dollars ($ 5,000.00) in cash paid to Vendor by Vendees, receipt of which is hereby acknowledged, Vendor hereby grants to Vendees the exclusive option, right or privilege to purchase the property described in the Purchase and Sale Agreement as set forth as Exhibit A attached hereto, being the same property subject to the Old Option granted on April 1, 1974, as aforesaid, for an aggregate purchase price of Five Million, Three Hundred Thousand Dollars ($ 5,300,000.00) (the "Purchase Price") to be paid as hereinafter set forth; such option to be exercisable by Vendees in the manner hereinafter specified during the period commencing as of the date hereof and ending at twelve noon E.D.T., *144 October 22, 1974. The new option agreement raises the purchase price of General Hospital to $ 5,300,000 and sets the price for the option itself at $ 5,000, which the optionees paid. The new option agreement provides that the optionees could exercise the option by paying $ 100,000 earnest money and by executing a purchase and sale agreement (exhibit A to the new option agreement) before midnight of October 23, 1974. The new option agreement provides that, on the exercise of the option, the $ 5,000 payment for the option would be applied towards the purchase price; if the option were not exercised, then the optionees would forfeit the $ 5,000. The new option agreement does not give the optionees credit towards the purchase price for the two $ 500 payments already made for the original option and its extension. Consistent with the optionees' decision to donate the option to a nonprofit organization, the new option agreement omits the restriction on assignment of the option to any party not owned or controlled by the optionees. Also on October 9, 1974, Arnold and Ralph executed the Counter Letter, which provides, in pertinent part, as follows: 1 - By instrument dated April 1, 1974, *145 [National] * * * granted an option to purchase [General Hospital] * * * for an aggregate option price of $ 5,200,000. Said option agreement was subsequently amended in part by instrument dated June 14, 1974, and extended through and including October 9, 1974 by letter dated June 28, 1974. 2 - By instrument dated October 9, 1974, [National] granted a second option to purchase the same property for an aggregate option price of $ 5,300,000. 3 - The price paid for the first option upon the granting thereof, was the sum of $ 500 cash, plus an additional $ 500 paid for the extension of the option period to October 9, 1974. The price paid for the second option upon the granting thereof was the sum of $ 5,000 cash. On or about October 21, 1974, the optionees exercised the option. On October 23, 1974, the optionees and National executed a purchase and sale agreement (hereinafter sometimes referred to as "the purchase and sale agreement") for the purchase of General Hospital, thereby exercising the new option. The purchase and sale agreement contains terms different from the new option agreement. Under the purchase and sale agreement, the $ 500 payments for the original option and for its *146 extension, as well as the $ 5,000 payment for the new option, are credited towards the purchase price; no earnest money is required; and the closing date is postponed from November 7 to November 14. In the purchase and sale agreement, National agrees to sell General Hospital, understanding that the following would occur: (1) the optionees would donate their rights to buy General Hospital, to a charitable nonprofit organization, St. Charles General Hospital, Inc. (hereinafter sometimes referred to as "Hospital, Inc."); (2) Hospital, Inc., would assign the right to buy, to the Authority; and (3) the Authority would buy General Hospital from National. On October 25, 1974, the optionees each donated to Hospital, Inc., their rights under the purchase and sale agreement. Hospital, Inc., then assigned the rights to the Authority, which bought General Hospital from National. The Authority then leased General Hospital to Hospital, Inc., for rental payments equal to the payments due on the bonds and for a term equal to the term of the bonds. Hospital, Inc., was given the right to buy General Hospital for $ 1,000 at the end of the lease. The chronology of events is shown in table 1. Table 1
1974 Date
Event
April 1
The original option entered into.
April 9
Start of the original option as modified
by the Collateral Agreement.
June 14
The Collateral Agreement entered into.
June 28
Extension of the original option as
modified by the Collateral Agreement.
July 1
Original expiration date of the original
option.
July 9
Expiration date of the original option
as modified by the Collateral
Agreement.
Sept. 28
90 days after original expiration date
of the original option.
October 7
90 days after expiration date of the
original option as modified by the
Collateral Agreement.
October 9
Expiration date of the original option
as modified by the Collateral
Agreement, as extended.
October 9
The new option entered into.
o/a October 21
The new option exercised.
October 22
Expiration date of the new option.
October 23
Deadline for executing the purchase and
sale agreement under the new
option. Executed on that date.
October 25
The optionees donated to Hospital, Inc.,
their rights under the purchase and
sale agreement.
*147 On their 1974 Federal tax return, petitioners claimed a charitable contribution deduction of$ 60,000 from the donation of the General Hospital purchase rights to Hospital, Inc. [4] After using $ 10,181 of the $ 60,000 for 1974, [5] petitioners carried the remainder forward, to their 1975, 1976, 1977, and 1978 tax returns, and deducted thereon $ 12,883, $ 10,392, $ 16,595, and $ 9,949, respectively. OPINION In general, petitioners are entitled to deduct, for any year, any contribution or gift to or for the use of any of certain types of organizations, if payment of the contribution or gift is made within that year. *148 Secs. 170(a)(1) and 170(c) (opening flush language). [6] The amount of the deductible contribution is generally the fair market value of the property at the time of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. However, if the taxpayer has held the property for an insufficient time to receive long-term capital gain treatment had the property been sold rather than contributed, then the taxpayer cannot deduct more than the adjusted basis in the property. [7] *149 Sec. 170(e) (1)(A). [8] For 1974, section 1222(3) required that a taxpayer hold property for more than 6 months in order to receive long-term capital gain treatment. The issue in the instant case is whether the optionees held the donated option for more than 6 months when they contributed it to Hospital, Inc. See table 1, supra. If they did, then petitioners are entitled to deductions based on the fair market value of Brown's share of the donated option. If they did not, then petitioners' deduction is limited to Brown's basis in the option. Petitioners contend that the new option was merely an extension of the original option and that Brown held the donated option for more than 6 months. Respondent contends that the new option was separate from the original option, *150 and that Brown had not held the donated option for more than 6 months when the optionees donated it. [9]
We agree with respondent. Reily v. Commissioner,53 T.C. 8 (1969), involved a series of six options to lease a tract of land in Baton Rouge, Louisiana. Reily sold, at a profit, the sixth option, which he had held for only 5 months and 18 days before selling it. In order to obtain long-term capital gain treatment on the sale, the taxpayers in Reily argued that the sixth option was a continuation of the prior, fifth option, which, as in the instant case, expired at the end of the same day that the new (sixth) option came into existence. We held, under facts very similar to those in the instant case that: (1) what Reily sold was the sixth option, with its own set of optionee rights, exercisable during a specified period; (2) at the time of the sale, the fifth option had long expired; (3) the sixth option was granted for a new consideration; and (4) the manner *151 in which the sixth option was to be exercised was entirely different from the manner in which the fifth option was to be exercised. We said that there was no provision in the Internal Revenue Code of 1954 authorizing, in such a situation, the tacking on of holding periods of separate contracts. Reily v. Commissioner,53 T.C. at 13. Petitioners have not presented any new authority, nor have we found any, to contradict our holding in Reily, and petitioners' attempts to distinguish the facts of their case from Reily fall short. The new option was separately negotiated; the changes in consideration and manner in which it was to be exercised reflect both that the optionees needed more time and that General Hospital's appraised value was higher than originally foreseen. The new option was granted for a different period and was to be exercised very differently: under the new option agreement, the purchaser was required to pay $ 100,000 earnest money and to execute a purchase and sale agreement. The new option cost $ 5,000 (ten times the amount that was paid to extend the original option for 90 days (or 92 days, see n.3, supra)), and the purchase price under the new option agreement was *152 $ 100,000 higher than under the original option agreement. See Reily v. Commissioner,53 T.C. at 13. We conclude that, when Brown and the other optionees contributed the new option to Hospital, Inc., they had held the new option for only a few weeks; their holding period for the original option is not taken into account in determining their holding period for the new option; and, under section 170(e)(1)(A), petitioners may not take a charitable contribution deduction for more than their cost basis for the new option. Petitioners argue that, because the purchase and sale agreement credited the optionees with the option monies paid under the original option, the option should be viewed as a mere extension of the original option. We disagree. We held the two options in Reily were separate, even though the option money paid for the fifth option in Reily was credited against the lease payments under the sixth option. Reily v. Commissioner,53 T.C. at 10. The original option agreement stated tha "Time is of the essence", and provided for only one extension. The time limitation in an option is critical ( Reily v. Commissioner,53 T.C. at 12), since the option binds the seller while leaving *153 the buyer free to gauge market conditions. By the time the optionees contributed their rights (October 25), the original option, as extended, had expired. Reily v. Commissioner,53 T.C. at 13. Petitioners point out that, in Reily, the first five options were in Reily's name, but the sixth option was in the name "of one Roland" and state that "the taxpayer [in Reily] simply did not carry the burden of proof that the sixth option to Roland was, somehow, a continuation of the fifth option to himself [Reily] and that the two should be treated as one for holding-period purposes." In Reily, Roland had executed a counter letter which stated that Reily was the true optionee and Roland was simply accommodating Reily. In our opinion in Reily we made it clear that the Reily-Roland problem did not affect our conclusion and that our conclusion was based on the four factors we have listed, supra. Reily v. Commissioner,53 T.C. at 12-13. On the basis of the record in the instant case, we are convinced by a preponderance of the evidence that the new option was a separate agreement, with its own significant consideration and with its own terms, and we so hold. The parties have disputed whether petitioners *154 should be allowed to present evidence concerning the intent of the optionees and National. They argue about whether the Fifth Circuit follows the so-called "Danielson Rule" ( Commissioner v. Danielson,378 F.2d 771, 775 (CA3 1967), revg. 44 T.C. 549 (1965)). They have drawn to our attention the unpublished opinions of the Court of Appeals for the Fifth Circuit and the District Court in Lupin v. United States, No. 81-3588 (CA5, July 9, 1982), involving the tax treatment of Arnold (one of the other optionees) but they have stipulated that "Neither petitioners nor respondent contends that these decisions have any res judicata or collateral estoppel effect on the instant case." Respondent also invokes the so-called "Golsen Rule" ( Golsen v. Commissioner,54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985 (CA10 1971)). In the instant opinion, we have taken into account the testimony of petitioners' witnesses, made findings of fact accordingly, and have applied to those facts the law that this Court described and applied in Reily almost 20 years ago. The result we reach, holding for respondent, is the same as that which was reached by the courts in Lupin v. United States when those courts *155 refused to take evidence as to intent. Accordingly, it is not necessary for us to determine whether petitioners' evidence should have been excluded under the parol evidence rule (respondent's objection, which we took under advisement, has been rendered moot), what the Fifth Circuit's position is with regard to the Danielson Rule, or whether the unpublished opinion of the Court of Appeals for the Fifth Circuit in Lupin v. Commissioner, supra, binds us under the Golsen Rule; rule 47.5.3, Rules of the United States Court of Appeals for the Fifth Circuit. We hold for respondent. Decision will be entered for the respondent.
Footnotes
1. A valuation issue would arise if we held for petitioners on the holding period issue. The valuation issue was severed for separate trial, which will not be necessary in light of our holding, infra.
Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954, as in effect for 1974. The instant case involves 1975 through 1978 solely because of claimed charitable contribution deduction carryovers on account of the 1974 option contribution.↩
2. All the optionees, other than Brown, were physicians -- Arnold, Ralph, Charles C. Mary, Jr. (hereinafter sometimes referred to as "Mary"), Louis Levy II, and Sam Lupin. According to the Counter Letter, each of the physicians had an 18-percent interest in the options.↩
3. On its face, the letter shows a receipt acknowledgement by Hager, dated "7/18/74". Even though the receipt is 9 days after the July 9, 1974, expiration date of the original option as modified by the Collateral Agreement, the parties have stipulated that the letter was effective to extend the original option. The letter states that the option period was being extended through "midnight October 9, 1974", even though 90 days after July 9, 1974, is October 7, 1974.
4. Petitioners attached to their 1974 Federal tax return a sheet stating that "The fair market value of the purchase option is $ 60,000. and is self appraised." ↩
5. This amount evidently was calculated by reference to 50 percent of petitioners' adjusted gross income for 1974. If petitioners were entitled to deduct the full fair market value of Brown's interest in the option, then it would appear that the maximum amount of the deduction for 1974 should have been calculated by reference to 30 percent of petitioners' adjusted gross income. See sec. 170(b)(1)(D)↩ as in effect for 1974.
6. Secs. 170(a)(1) and 170(c) provide, in pertinent part, as follows: SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (a) Allowance of Deduction. -- (1) General rule. -- There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. * * * * * * (c) Charitable Contribution Defined. -- For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of -- ↩
7. Neither party argues that the options in issue were other than capital assets, and we do not address the issue. 8. Sec. 170(e) (1)(A) provides, in pertinent part, as follows: SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. * * * (e) Certain Contributions of Ordinary Income and Capital Gain Property. -- (1) General rule. -- The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by * * * (A) the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution) * * * ↩
9. Respondent does not argue that the Collateral Agreement created a separate option for purposes of computing Brown's holding period in the donated option. In light of our holding, it is unnecessary for us to address the issue.↩