AMERICAN NATIONAL BANK & TRUST CO., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent American Nat'l Bank & Trust Co. v. Commissioner
Docket Nos. 2854-72, 2855-72, 2901-72.
United States Tax Court
T.C. Memo 1974-263; 1974 Tax Ct. Memo LEXIS 56; 33 T.C.M. (CCH) 1158; T.C.M. (RIA) 740263; October 3, 1974, Filed. *56 Held, the value of the assets in a trust established in 1955 in decedent's name and with decedent as the named grantor, under the terms of which decedent reserved unto herself the income for life, is taxable in decedent's estate despite petitioners' claim that the assets transferred to the trust really belonged to decedent's husband and that he was the real grantor of the trust. Bernard M. Lubelchek, for the petitioners. Seymour I. Sherman, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in *57 the Federal estate tax due from the estate of Belle Shafton, decedent herein, in the amount of $1,244,603.80. The only issue is whether the value of the assets of a trust bearing decedent's name must be included in her gross estate. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners American National Bank and Trust Co. of Chicago (hereinafter Bank) and Arthur Shafton are co-executors of the will and estate of Belle Shafton. They were also co-trustees of the Belle Shafton Trust, whose assets are here at issue, at the date of Belle Shafton's death. Petitioners Arthur Shafton and Carol Shafton Rock were transferees of the assets of the Belle Shafton Trust after decedent's death. At the time of filing of the petitions herein, petitioners were all residents of Chicago, Ill.
Belle Shafton was born March 6, 1881, and died June 14, 1968, a resident of the State of Illinois. On September 15, 1969, a Federal estate tax return was filed for her estate with the district director of internal revenue at Chicago, Ill. The only assets owned directly by decedent at the date of her death (excluding for this purpose any consideration of the *58 Belle Shafton Trust) consisted of her interest in jointly-owned property having a total value at such date and at the optional valuation date of $38,193.81. All of such assets passed to the sole ownership of the other joint tenant on the date of the decedent's death. Decedent and Leo Shafton (hereinafter called Leo) were married in about 1900. They continued to live as husband and wife until Leo's death on February 16, 1957. Decedent and Leo had two children, Arthur, who was born in 1905, and Kirvin, who was born in 1909 or 1910, and died in 1963. Leo was an active and aggressive businessman. Between 1905 and 1929, he and his nephew, Jacob Shafton, established and operated a thriving wholesale produce business in Chicago. In the 1920's, Jacob and Leo also invested in real estate; during that same time, Leo speculated in the stock market and made perhaps a half million dollars. Financial reverses, however, came with the 1929 crash. Leo fell heavily into debt and was obliged to borrow substantial sums from Jacob. The business ventures of Leo and Jacob became in danger of bankruptcy; to save them, several were incorporated separately. Two real estate investment properties, *59 a teaming company, and the produce company thus became individual corporations. Except in the case of the teaming company, each of the articles of incorporation listed the capital stock subscribers as Jacob W. Shafton, Leo Shafton, and Lester B. Shafton, an attorney and Jacob's son. The articles of the teaming company listed the capital stock subscribers as Jacob W. Shafton, Leo Shafton, and John Ritter. One of the real estate corporations obtained its property by two grant deeds (the second an amended version of the first) signed by four persons: Jacob Shafton, Rose Shafton, Leo Shafton, and Belle Shafton. On each deed, the handwriting of the signature of Belle Shafton appears to be different from that of Leo Shafton. Leo retired from most business activities in the 1940's. Leo tended to be exclusively in control of his family's financial affairs. Leo was proud of his investment ability and spoke of stocks as his own whether they were in his name or decedent's. Leo paid the household bills and did the household shopping. Beginning in 1955, he conducted stock transactions through a brokerage house using accounts in both his and decedent's names. Leo engaged in stock transactions *60 frequently, making daily calls to the brokerage house.Decedent had only trivial and incidental contact with the brokers. Leo alone dealt with the accounting firm which kept records of stock holdings and transactions, and prepared joint income tax returns, in Leo's and decedent's names. When Kirvin Shafton married, Leo considered removing from Kirvin's name stocks he had placed there, lest Kirvin's wife be less easy to dominate financially than Kirvin had been. At times, Leo signed decedent's name to documents needing her signature; other times decedent signed her own name. In contrast to her husband, decedent was unfamiliar with financial affairs. Her role in her marriage was entirely that of housewife and mother. She was given nominal sums by her husband for spending money. In 1953 or 1954, when Leo was about 80 years old and Belle was about 73 years old, Leo told his attorney he wanted to set his estate in order. He told his attorney he was concerned lest the amounts accumulated in his and decedent's names be dissipated in the event of his incompetency or death. Leo wanted to be in control of those assets while he was living and competent; thereafter he wanted Belle to *61 be adequately provided for by the income produced by such assets but he did not want her to have access to the assets themselves. Leo had always dominated his wife and two sons, and he felt he could continue to do so as long as he was alive and competent. Leo met with his attorney and one or more officers of the American National Bank and Trust Co. from time to time to discuss a plan for the accomplishment of his objectives. Belle was present at many of these meetings but did not actively participate therein; however, as the documents were drafted bearing her name she was asked whether she would assent to the provisions thereof. The plan agreed upon involved the establishment of two trusts, one of which was to be known as the Belle Shafton Trust, which Belle executed as grantor, and the second of which was to be known as the Leo Shafton Trust, which Leo executed as grantor. Both trust agreements were executed on August 5, 1955. The key provisions of the two trusts were as follows: Arthur Shafton and Kirvin Shafton, the two sons of Leo and Belle, were named as trustees of the Belle Shafton Trust. Belle transferred to the trustees the properties set forth in a schedule attached. *62 The American National Bank & Trust Co. was named as an additional trustee upon the occurrence of either (1) the death or incompetency of Leo, or (2) the resignation, death, disqualification, etc., of either or both of the individual trustees. The income of the Belle Shafton Trust was to be paid to Belle as she directed as long as she was alive. While Leo was still alive and competent Belle could also direct the trustees to transfer to her any part of the trust estate. Upon Belle's death the income of the trust was payable to Leo if he survived her. If at any time in the opinion of the trustees the income of the trust plus his income from other sources, was insufficient to provide for Leo's comfortable support, the trustees were authorized to pay additional sums to Leo out of principal. Upon the death of Leo, or of Belle if she predeceased Leo, the trust was to terminate and the trust estate was to be distributed in equal shares to Arthur and Kirvin, or their issue. This trust was to become irrevocable upon Leo's death or incompetency. The schedule attached to the Belle Shafton Trust listed the following assets as being transferred to the trust. Corporation
Number of Shares Standard Oil Co. of Indiana
400
Sinclair Oil Corp.
162
Beatrice Foods Co.
70
William Wrigley, Jr., Co.
25
Standard Oil Co. of New Jersey
29
John R. Thompson Co.
136
The Diamond Match Co.
316
Fruit Auction Sales Co.
558
International Business Machines Corp.
446
Di Giorgio Fruit Corp.
86
Fulton Market Cold Storage Co.
203
Warner Bros. Pictures, Inc.
83
Argo Oil Corp.
600
General Motors Corp.
160
Butler Brothers
200
Stanley Warner Corp.
83
Continental Illinois National Bank
60
International Harvester Co.
126
Standard Dredging Corp.
200
Central Cold Storage Co.
275
Commonwealth Edison Co.
200
Northern Illinois Gas Co.
68
*63 Arthur and Kirvin Shafton were also named as trustees of the Leo Shafton Trust. Under the terms of the trust agreement Leo transferred to the trustees the assets listed on a schedule attached. The American National Bank and Trust Co. was also named as an additional trustee upon the occurrence of either (1) the death or incompetency of Leo, or (2) the resignation, death, disqualification, etc., of either or both of the individual trustees. The income from this trust was payable to Leo as he directed as long as he was alive. He could also direct the trustees to transfer to him any part or all of the trust estate. Upon Leo's death the income was to be distributed to Belle as long as she lived. If the opinion of the trustees the income from the trust, plus her other income, was insufficient to provide for Belle's comfortable support, the trustees were authorized to pay to her from principal such amounts as they deemed advisable. Upon Belle's death, or Leo's death if she predeceased him, the trust was to terminate and the trust estate was to be distributed equally to the children or their issue. This trust was not specifically made irrevocable. The assets listed on the schedule *64 attached to the Leo Shafton Trust agreement were as follows: Corporation
Certificate No.
Class of stock
Date of certificate
Number of shares Central Cold Storage Co.
CO 2949
May 23, 1946
65
Central Cold Storage Co.
506
Dec.10, 1924
500
Central Cold Storage Co.
507
Dec.10, 1925
500
Snow Ice, Inc.
242
Common
June 20, 1946
121
Snow Ice, Inc.
87
Common
Apr. 10, 1942
11
Snow Ice, Inc.
36
Common
Apr. 22, 1940
100
Snow Ice, Inc.
35
Common
Apr. 22, 1940
100
Snow Ice, Inc.
120
Common
Apr. 27, 1942
393
Leo Shafton also executed a last will and testament on August 5, 1955, which was admitted to probate after his death. Under the provisions of the will, after giving all his tangible personal property to Belle and making four $1,000 bequests to grandchildren, Leo devised all the rest and residue of his estate to Belle, if she survived him, otherwise to his two sons. The American National Bank & Trust Co., Arthur, and Kirvin were named coexecutors of the will. Between 1920 and 1937, several stocks later placed in the Belle Shafton Trust came to be registered on their corporation's books in decedent's name, after *65 being registered in the names of other members of her family. After 1937, none was transferred out of decedent's name until formation of the trust in 1955. On October 27, 1915, a certificate for 20 shares of Computing-Tabulating-Recording Co., the predecessor of International Business Machines Co. (IBM), had been issued in the name of Leo Shafton. On April 16, 1920, that certificate was cancelled and replaced by a certificate representing 20 shares in the name of Belle Shafton. All shares in IBM which were eventually transferred to the Belle Shafton Trust are attributable to the foregoing certificate, either through stock dividends, stock splits, or other corporate actions. In 1920 the stock of IBM (Computing-Tabulating-Recording Co.) was listed on the New York Stock Exchange. Transactions in such stock which were conducted through that exchange during April 1920 were at a high of 51 and a low of 49-1/2. The bid and asked prices of such stock on October 27, 1915, were 45 and 48, respectively. On June 11, 1920, the Fulton Market Cold Storage Co. issued two stock certificates to Leo and Jacob W. Shafton - one for six shares of common, the other for 20 shares of preferred. *66 On December 6, 1932, those certificates were surrendered; two certificates, for three shares of common and ten preferred, were issued to Belle Shafton; two certificates in the same denominations were issued to one Rose Shafton. The receipt for the certificates issued in decedent's name bears the signature, in uniform handwriting "Belle Shafton By L. Shafton." On March 8, 1934, the certificates in decedent's name were surrendered, and certificates in the same denominations were issued to Kirvin Shafton. On June 7, 1937, the certificates in Kirvin's name were surrendered and certificates in the same denominations were issued in Belle Shafton's name.On October 17, 1944, the 10 shares of preferred stock in decedent's name were redeemed by the company for 200 shares of common stock plus other consideration. On August 31, 1955, the 203 shares of common stock then in decedent's name were surrendered and new certificates in the same total denomination were issued in the name of the Belle Shafton Trust. Between August 31, 1922, and February 2, 1931, eight certificates of stock in Commonwealth Edison Co. totaling 27 shares were issued in decedent's name. On February 23, 1934, seven of *67 those certificates totaling 24 shares were surrendered. The surrendered certificates show as the transferee "Munds, Winslow & Potter, 40 Wall St., New York, N.Y." A signature reading "Belle Shafton" appears under the date February 21, 1934; a witness' signature not that of Leo Shafton and another signature under the inscription "SIGNATURE GUARANTEED" appear under decedent's name on each certificate. On April 8, 1935, two certificates, of 25 and 22 shares, were issued in decedent's name. These two certificates bear decedent's signature under the date April 15, 1935. The witness' signature on each reads "Kirvin Shafton." On August 14, 1937, two more certificates, totaling 150 shares, were issued in decedent's name. These certificates bear the signature, undated, "Belle Shafton." The witness' name, in what appears to be different handwriting, reads "L. Shafton." On August 5, 1955, all certificates then in decedent's name, totaling 200 shares, were transferred to the Belle Shafton Trust. On September 14, 1955, those certificates were surrendered to the company. In addition to the shares in IBM, Fulton Market Cold Storage Co. and Commonwealth Edison Co., the following shares transferred *68 to the Belle Shafton Trust had previously been registered in the names of other members of the Shafton family: (1) Company
(2) Prior Registered Owner
(3) Date and No. Shares on Registration in Decedent
(4) Value on Date in Column (3) Wm. Wrigley, Jr. & Co.
Leo
5/30/30 - 3
216.20
Wm. Wrigley, Jr. & Co.
Kirvin
7/23/31 - 11
797.50
Wm. Wrigley, Jr. & Co.
Arthur
7/23/31 - 10
725.00
Wm. Wrigley, Jr. & Co.
Arthur
7/26/31 - 1
72.19
University National Bank
Leo
9/28/32 - *
*
Di Giorgio Corporation
Kirvin**
5/28/34 - 10
105.63
Fruit Auction Sales Co.
Leo
1/14/36 - 429
*
Standard Oil (Indiana)
Kirvin
1/8/37 - 300
14,025.00
The source of the shares of stock in corporations other than those mentioned above, which were transferred to the Belle Shafton Trust in 1955, cannot be determined from the record. Leo's intent was to control the assets in both trusts during his lifetime and competency. Leo's purpose in causing the trust instruments to appoint the Bank as an additional trustee in the event of his death or incapacity was to bring into control *69 of the trust assets the administration, advice, and consulation of the Bank and its trust department thereafter. After the trusts were established in his and decedent's names, Leo apparently took receipt of the trust assets back from both trusts and continued to treat or handle them as he had before the trusts were set up. Leo used income from the trust assets for family living expenses. He continued to transact business through the brokerage house he had used before the trusts were established. However, Leo did not trade with the stocks that had been issued in Belle's name and had been transferred to the Belle Shafton Trust. Leo died on February 16, 1957. On that date, the total value of the assets in the Belle Shafton Trust was $448,811.08.No Federal estate tax return has been filed for Leo's estate, and no amount has been paid by or on behalf of Leo's estate, for Federal estate taxes. However, an Illinois Inheritance Tax Return was filed for Leo's estate which reflected a tax liability of $90. The Illinois Inheritance Tax Return filed for the estate was signed under oath by Arthur Shafton and a representative of the American National Bank and Trust Co. as co-executors *70 of Leo's estate. The return showed a total net estate in the amount of $40,238.37; the return form required disclosure of the following: SCHEDULE B-2 - TRANSFERS IN CONTEMPLATION OF OR INTENDED TO TAKE EFFECT AT OR AFTER DEATH 9. That Schedule B-2 (following or hereunto annexed) contains a statement of all property, real and personal, (a) With respect to which this decedent prior to his death made any transfer by deed, grant, bargain, sale, or gift while sick or injured, or otherwise impelled or induced by a sense of impending death, and every transfer by deed, grant, bargain, sale or gift made within two years prior to the death of the decedent without adequate valuable consideration in money or money's worth, shall be reported in this schedule. [Emphasis supplied.] * * * All such transfers, if any, shall be reported in this schedule in accordance with subparagraph "b" of paragraph 6 of the regulations of the Attorney General. The response to the above portion of the return read as follows: 7. Decedent created a trust by agreement dated August 5, 1955 under which agreement he transferred certain assets to the trustees and directed the income from said assets to *71 be paid to himself during his lifetime. The assets in said trust at decedent's death were: 1,065 shares Central Cold Storage Co. @ 28.374 $30,219.38 Copy of Trust Agreement Attached. The trust agreement referred to and attached to the return was that of the Leo Shafton Trust. A separate sworn statement by Arthur Shafton and a representative of the American National Bank and Trust Co. filed as part of or attached to the inheritance tax return contains the following question and answer: 20. Did the undersigned make diligent and careful search for the existence of any trusts created by the decedent during his lifetime or any trusts created by other persons under which the decedent possessed any power of beneficial interest? Yes. Following Leo's death, a meeting was held between members of the Shafton family, the trust administrator of the Bank, the Shafton family's lawyer, and Leo's accountant. The conclusion was reached that on Leo's death the Belle Shafton Trust had become irrevocable and that Belle was liable for a gift tax based upon the then value of the trust assets. The further conclusion was reached that Belle had insufficient funds to pay the tax and that it *72 would not be desirable at that time to sell trust assets and incur capital gains taxes in consequence. Funds were then borrowed from the Bank to pay the tax. A Federal Gift Tax return for the calendar year 1957 was filed by or on behalf of Belle, and gift tax was paid in the amount of $67,494.88. The amount of the taxable gift shown in the return was computed as the remainder interest after Belle's death in the Belle Shafton Trust and was described as follows: On August 5, 1955 Belle Shafton, as Settlor, created a trust under agreement with Arthur L. Shafton and Kervin K. Shafton as Trustees and American National Bank and Trust Company of Chicago as Trustee effective upon the death of Leo Shafton, husband of Settlor, transferring to said Trustees, the property described in Schedule A attached thereto. Under ARTICLE SIXTH, Paragraph 6.01 of said agreement, the Settlor expressly waived all right and power to revoke, amend or alter the trust, effective upon the death of Leo Shafton, husband of Settlor. The Settlor retained the income for life and provided that upon her death, her husband having predeceased her, the trust estate is to be divided into equal shares for each child *73 of the Settlor then living. Leo Shafton, husband of Settlor, died on February 17, 1957 and the trust became irrevocable. (See copy of agreement attached.) As of February 17, 1957, the assets comprising the trust estate, as shown on the attached list, had a value of $448,811.08. The value of the gift under CFR 25.2512-5(c) (proposed) is the value of the assets less the value of the life estate retained by the Settlor. Age of Settlor on February 17, 1957 - 76 Factor from Col. 3 of Table 1 for age 76 is .79302 Value of gift .79302 of $448,811.08 equals $355,916.16. The Bank filed a Donee Information Return as co-trustee of the Belle Shafton Trust consistent with the gift tax return filed in 1957. Beginning in at least 1964 the Belle Shafton Trust sold some of its securities from time to time, including shares of stock in IBM. In computing gain or loss on all such sales prior to decedent's death, a basis was claimed in the IBM shares in varying but nominal amounts, consistently less than $20.00 per share. Federal income tax returns filed by the trust for 1964 to 1967, inclusive, expressly identified decedent as sole grantor.No provision for identifying the grantor appears *74 in the printed form for 1968. Shortly after decedent's death, the Belle Shafton Trust made several sales of IBM stock. Its Federal income tax return for 1968, filed March 17, 1969, and signed by a representative of petitioner American National Bank, shows one sale prior to decedent's death and eight sales thereafter. In computing gains or losses on such sales, a basis (cost) of about $8.00 per share was claimed with respect to the sale prior to decedent's death, and a basis of $355.50 per share, the value at the date of decedent's death, was claimed with respect to each of the eight sales after that date. On or about September 25, 1968, assets of the Belle Shafton Trust having an aggregate fair market value of $897,330.82 on such date were distributed to petitioner Carol Shafton Rock. [2]
On or about April 7, 1969, assets of the Belle Shafton Trust having an aggregate fair market value of $442,480.20 on such date were distributed to petitioner Arthur Shafton. It is stipulated that the value of the assets of the Belle Shafton Trust was $3,100,958.27 on the alternate valuation *75 date elected on the estate tax return, as determined by respondent. No issue has been raised as to the transferee liability of petitioners if it is determined that the value of the trust assets is taxable in Belle's estate. ULTIMATE FINDING OF FACT Belle Shafton was the grantor of the Belle Shafton Trust. The assets that were transferred to the Belle Shafton Trust when it was created were owned by Belle Shafton. OPINION This case involves a factual determination as to the ownership for Federal estate tax purposes of securities placed in a trust bearing decedent's name and with decedent as lifetime income beneficiary. The securities were held in decedent's name at the time the trust was created and the trust instrument showed decedent as the grantor. Respondent determined that the trust corpus should be included in decedent's estate under section 2036, I.R.C. 1954. [3] Petitioners, transferees and trustees [4] of assets in the trust, assert that decedent's apparent ownership of the securities before the trust was established was merely formal, that in substance decedent's husband, who predeceased her, owned the securities and established the trust. They argue that under *76 such circumstances Belle could not have made a transfer of property in trust, reserving to herself the right to the income from the property for life, so as to make the value of the trust estate taxable in her estate under section 2036. *77 Although our inquiry here is primarily factual, the parties have raised a question with respect to petitioner's burden of proof. It is undisputed that at the time the Belle Shafton trust was established the securities placed therein were registered with the issuing corporations in decedent's name. At all times material hereto, decedent and her husband were Illinois residents. It is clear that Illinois law "controls in determining the nature of the legal interest which the [decedent] had in the property or income sought to be reached by the statute." Morgan v. Commissioner, 309 U.S. 78, 82 (1940). [5]Illinois law creates a presumption, rebuttable only by clear and convincing evidence, [6] that when a husband purchases property and takes title in his wife's name, a gift has been made to the wife. Hanley v. Hanley, 14 Ill. 2d 566, 152 N.E. 2d 879, 882-83 (1958); Pollard v. Pollard, 12 Ill. 2d 441, 147 N.E. 2d 66, 68 (1957). The question raised is whether to overcome respondent's determination that the value of the assets in the Belle Shafton Trust are includable in her estate because under the terms of the trust she reserved unto herself the *78 right to receive the income of the trust for life, petitioners must do so by only a preponderance of the evidence, the usual burden of proof on petitioners before this Court, [7] or whether they must provide clear and convincing evidence to overcome the presumption stated by Illinois law. We find it unnecessary *79 to answer this rather interesting question because based on the entire record we find that petitioners have not carried their burden of proving, even by a preponderance of the evidence, that respondent's determination is erroneous. In fact we are convinced by the evidence presented that Belle was the grantor of the Belle Shafton Trust and was the owner of the assets transferred thereto at its inception, and we have so found as ultimate facts. Petitioners produced a plethora of evidence, both oral testimony and documentary, which tends to show that Leo either did or probably did pay for the original 20 shares of IBM stock which were transferred to Belle's name in 1920 and from which the greater part of the value of the trust assets spring. Petitioners' evidence also tends to prove that Leo originally purchased some of the other stocks that were registered in Belle's name and eventually wound up in her trust. On the other hand, there is a lack of any evidence with respect to how some of the other stocks were acquired and registered in Belle's name; whether by reinvestment of proceeds from the other stocks registered in her name or directly from Leo, we do not know. The evidence *80 is convincing that Belle did not earn the money herself to buy the stock. Petitioners' evidence is also convincing that Leo dominated the business and financial affairs of his family and could do what he wanted with the family assets, whether they were his or Belle's. We are also convinced that Leo, and his advisors, devised the plan for creation of the two trusts and dictated the terms thereof, and that Belle merely accepted his suggestions and acquiesced therein. This is a far cry however from proving that Leo was the owner, legally or beneficially of the assets that were transferred to the Belle Shafton Trust and/or that Leo was the grantor of that trust. The weight of the evidence proves to the contrary. The parties have stipulated that immediately prior to creation of the Belle Shafton Trust all of the assets conveyed to it stood solely in decedent's name. The record before us is entirely silent as to the circumstances of the transfers of those assets into decedent's name. Every stock whose ownership history is traced in the record, however, was transferred into decedent's name either from another member of her family or from an outsider no later than 1937 and remained *81 in decedent's name continuously from at least that date until transferred to the trust. [8] One of the stocks involved, IBM, which formed the bulk of the value of the trust, was first registered in decedent's name in 1920 and remained in her name until creation of the trust. *82 This long, continued holding of record title in decedent's name would even in isolation be very persuasive that substantive ownership resided in decedent as well.See Adair v. Shallenberger, 119 F.2d 1017, 1020 (C.A. 7, 1941); and cf. Brennan v. Udall, 379 F.2d 803, 807-8 (C.A. 10, 1967). Here, however, other weighty documentary evidence, and circumstances, supports a finding of ownership in decedent as well. Leo arranged for the creation of the two trusts and dictated the terms thereof. This was apparently a part of an overall plan for the disposition of Leo's and Belle's estates, because Leo also executed his last will on the same date that the trust agreements were executed. It seems odd that under such circumstances if Leo thought the stock registered in Belle's name was actually his that he would have established a second trust in Belle's name.He could have more surely controlled those assets had he put them into the Leo Shafton Trust. Of course, this may have raised a question of gift tax liability for Belle at that time, because the stock was all registered in her name. It may also have ultimately resulted in estate tax liability for Leo's *83 estate. Leo's actions in deliberately establishing a second trust in Belle's name with Belle named as transferor of the assets to the trust would confirm Leo's transfer or gift of these assets to Belle, if any such confirmation was necessary. Furthermore, under Leo's will Belle would inherit practically all of his estate outright. If Leo was so concerned about conserving the assets as petitioners would have us believe and if Leo thought that he owned the stock that went into the Belle Shafton Trust, it is inconceivable that he would make such a provision in his will. There is nothing to support petitioners' tentative contention that Leo was the settlor of the Belle Shafton Trust. He did not sign the trust agreement and he did not have a transferable title to the stocks transferred to the trust to provide a corpus for the trust. If Belle Shafton did not create the Belle Shafton Trust, the trust was invalid. If the Belle Shafton Trust was invalid this would leave ownership of the trust assets in either Belle or Leo. If Belle was the outright owner at the time of her death the value of those stocks would be taxable in her estate. On the other hand, if Leo was the owner *84 of those stocks at the time of his death, they would have passed to Belle under the terms of Leo's will and she would again have been the owner thereof at the time of her death, with the same tax result in her estate. Petitioners have not indicated to us either why they think Leo could have been the grantor of the Belle Shafton Trust or why the tax result would be any different for Belle's estate if the Belle Shafton Trust was invalid. But regardless of the end result of petitioners' claim that Leo was the owner of the assets at the time the trust was created, we are convinced by the facts and circumstances that Leo recognized at the time the trusts were created that Belle was the owner of the assets that were transferred to the Belle Shafton Trust, and that she was in fact the owner thereof. Subsequent events confirm our conclusion. When Leo died in February of 1957, less than 2 years after the trusts were created, the representatives of his estate did not file a Federal estate tax return, which would have been required had Leo been either the owner or transferor of the Belle Shafton Trust estate, and they did not report on the Illinois Inheritance Tax return either any interest *85 in, or a transfer of, the assets in the Belle Shafton Trust. A separate sworn statement filed with the return and also signed by Arthur Shafton and a representative of the Bank contained the following question and answer: Did the undersigned make diligent and careful search for the existence of any trusts created by the decedent during his lifetime or any trusts created by other persons under which the decedent possessed any power of [sic ] beneficial interest? Yes. Following Leo's death, a Federal gift tax return was filed in decedent's name and Federal gift tax was paid by her or on her behalf based on the value at Leo's death of the corpus of the Belle Shafton Trust. A donee information return filed by petitioner American National Bank as cotrustee of the Belle Shafton Trust was consistent with the Federal gift tax return. In its Federal income tax returns for the years 1964 through 1967, the Belle Shafton Trust expressly identified decedent as sole grantor of the trust. The trust's 1968 return did not contain a provision for identifying the trust's grantor; it did, however, show that after decedent's death in 1968 the trust began claiming a stepped-up basis in property *86 sold by it, which would be appropriate at that time only if the trust property had been includable in decedent's estate for Federal estate tax purposes. [9]
We think the above returns, and the failure to file a Federal estate tax return for Leo's estate, amount to admissions by the parties that decedent was in fact the settlor of the Belle Shafton Trust and the owner of the trust corpus before the trust was established.Because the above items of evidence came into being well before institution of the present proceedings, and were closer in time to the events now before us, we accord them considerable weight. Petitioners' burden of proof in this case is, and should be, heavy. Record title to the stock transferred to the Belle Shafton Trust was in Belle's name when the trust was created and had been for a long time. The two trusts were designed by Leo, acquiesced in by Belle, and Belle was named as grantor of the Belle Shafton Trust and was the only person that signed the trust agreement as grantor.Petitioners, American National Bank and Trust Co. and Arthur Shafton, as executors of Leo's estate and trustees of the Belle Shafton Trust acted in conformity *87 with the terms of the trust agreement in the settlement of Leo's estate, the filing of a gift tax return in Belle's behalf, and the filing of income tax returns for the Belle Shafton Trust. Respondent has accepted the provisions of the trust agreement and the actions of the decedent's and the petitioners pursuant thereto at face value and has determined that under the provisions of the trust agreement the value of the assets in the trust at the time of her death is taxable in Belle's estate; which determination carries with it a presumption of correctness. Petitioners do not deny that if the facts are as reflected in the trust agreement, the value of the trust assets is taxable in Belle's estate. Instead petitioners seek to disavow the actions of the two decedents in establishing the trusts and of their representatives in acting pursuant to the terms thereof and ask the Court to either rewrite or ignore the terms of the trust agreement. We decline to do so. Where the Commissioner determines that the form in which a taxpayer casts his transactions reflects the true substance of those transactions, it would indeed require strong proof to overcome the presumption that the Commissioner's *88 determination is correct. Commissioner v. State-Adams Corporation, 283 F.2d 395 (C.A. 2, 1960); Dodd v. Commissioner, 298 F.2d 570 (C.A. 4, 1962); Ullman v. Commissioner, 264 F.2d 305, affirming 29 T.C. 129; J. Leonard Schmitz, 51 T.C. 306, affirmed sub nom. Throndson v. Commissioner, 457 F.2d 1022. See also Burnet v. Commonwealth Imp. Co., 287 U.S. 415; Commissioner v. Danielson, 378 F.2d 771, reversing for a different reason 44 T.C. 549. Such proof is lacking in this case. Petitioners' evidence indicating that Leo completely dominated Belle in handling the family financial and other affairs, and that Leo paid for the stock originally, is not inconsistent with the fact that Belle owned the stock at the time the trust was created. On the other hand, petitioners' argument that Leo owned the stock and/or was the actual grantor of the Belle Shafton Trust is entirely inconsistent with the actions taken by Leo and Belle in establishing the trusts and the subsequent actions of their representatives in filing the various returns mentioned above. Petitioners disavow any *89 attempt on Leo's part to avoid taxes by setting up the trusts as he did but they offer no explanation of why Leo and Belle would have set up the trusts as they did if Leo had in fact been the owner of the stock that was transferred to the Belle Shafton Trust. Petitioners claim that it was error to file the various returns in the manner they were filed but despite the fact that we heard testimony from lawyers, accountants, and bank officials, none of them accepted responsibility for making the decisions to file the returns as they were filed. The finger of responsibility was pointed to an attorney working for the bank who was deceased at the time of this trial. We conclude that the value of the assets in the Belle Shafton Trust at the time of Belle's death is taxable in her estate under section 2036 of the Code. Decisions will be entered under Rule 155. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Carol Shafton Rock, docket No. 2855-72, and Arthur Shafton, docket No. 2901-72. ↩
*. Not contained in record. ** First from Leo to Kirvin, on the same date. ↩
2. Kirvin Shafton predeceased Belle and Carol Shafton Rock was apparently Kirvin's daughter. ↩
3. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated. SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE. (a) General Rule. - The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death - (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom. ↩
4. Petitioner Carol Shafton Rock was a transferee but not a trustee. ↩
5. "State law creates legal interests and rights. The federal revenue acts designate what interest or rights, so created, shall be taxed. Our duty is to ascertain the meaning of the words used to specify the thing taxed. If it is found in a given case that an interest or right created by local law was the object intended to be taxed, the federal law must prevail no matter what name is given to the interest or right by state law. " [Citations footnoted. Fn. omitted.] Id. 80-81. See also Aquilino v. United States, 363 U.S. 509, 512-13↩ (1960). 6. Compare, however, Scanlon v. Scanlon, 6 Ill. 2d 224, 127 N.E. 2d 435, 438-39↩ (1955), suggesting that a lesser quantum of proof may overcome the presumption. 7. See Shea v. Commissioner, 81 F.2d 937, 940↩ (C.A. 9, 1936); Rule 142 of the Rules of Practice and Procedure of this Court. 8. On April 16, 1920, 20 shares of Computing-Tabulating-Recording Co. (later IBM) were transferred on the corporation's books to decedent's name from that of Leo, who had held them since 1915. Between 1920 and 1937, 13 shares of the Fulton Market Cold Storage Co. were shown on the corporation's books under the names of Leo (as coowner of 26 shares with Jacob Shafton), decedent, Kirvin Shafton, and then decedent again. On May 30, 1930, three shares of Wm. Wrigley, Jr. & Co. were transferred on the corporation's books from Leo's name to decedent's; on July 23, 1931, 21 shares were transferred from the names of Kirvin and Arthur Shafton to decedent's name; on July 26, 1931, one share was transferred from Arthur Shafton's name to decedent's. On September 28, 1932, an interest in the University National Bank was transferred from Leo's name to decedent's.On May 28, 1934, ten shares of the Di Giorgio Corp. were transferred from Leo's name to Kirvin's, and from Kirvin's to decedent's on the same date. On January 14, 1936, 429 shares of the Fruit Auction Sales Co. were transferred from Leo's name to decedent's. On January 8, 1937, 300 shares of Standard Oil of Indiana were transferred from Kirvin's name to decedent's. ↩
9. See sec. 1014(a). ↩