T.C. Memo. 1995-589


UNITED STATES TAX COURT



FRERES LUMBER CO., INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16062-93.      Filed December 13, 1995.


<u>Philip N. Jones</u>, <u>Stephen J. Klarquist</u>, and <u>Richard W.</u>
<u>Miller</u>, for petitioner.

<u>Brenda M. Fitzgerald</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COLVIN, <u>Judge</u>:  Respondent determined that petitioner had
deficiencies in Federal income tax of $29,750 for 1988, $40,732
for 1989, and $51,119 for 1990.  In an amended answer, respondent
asserts that petitioner has deficiencies in Federal income tax of

$43,787 for 1988, $64,689 for 1989, and $74,786 for 1990.  After concessions, we must decide the following issues:

1.   Whether the fair market value of three covenants not to compete on March 1, 1988, is $1,650,000 as petitioner contends, $403,000 as respondent contends, or some other amount.  We hold that it is $930,000.

2.   Whether the fair market value of certain land on March 1, 1988, is $145,000 as petitioner contends, $200,000 as respondent contends, or some other amount.  We hold that it is $145,000.

3.   Whether the fair market values of buildings and improvments, equipment, and rolling stock on March 1, 1988, are $283,000, $1.5 million, and $290,000, respectively, as petitioner contends; or $195,000, $1.1 million, and $225,000, respectively, as respondent contends and as petitioner reported on its return. We hold that they are $384,608 for buildings and improvements, $1.5 million for equipment, and $290,000 for rolling stock.

4.   Whether the fair market value of goodwill on March 1, 1988, is zero as petitioner contends, $750,000 as respondent contends, or some other amount.  We hold that it is zero.

Section references are to the Internal Revenue Code in effect for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.  Petitioner

Petitioner is an Oregon corporation, the principal place of business of which is in Lyons, Oregon.  Petitioner operated sawmills and wood veneer mills in North Santiam Canyon in western Oregon.  The Freres family owned a controlling interest in petitioner.  The common stock of petitioner was owned as follows: 40.90 percent by Robert T. Freres, 29.69 percent by Theodore F. Freres, and 29.41 percent by Doris Wipper (not otherwise identified).  Robert T. Freres, Jr., son of Robert T. Freres, began to manage petitioner in 1979.  He and petitioner's owners were officers of petitioner.  Robert T. Freres, Jr., was the vice president of petitioner in 1988.

Robert T. Freres, Jr.'s grandfather established petitioner in 1922 to operate a sawmill.  In the late 1950's, the Freres family dismantled the sawmill and began to manufacture veneer. They added a second veneer mill in 1963 and a stud mill in 1970. In 1985, they leased a plywood mill and a veneer plant.  Before March 1, 1988, they operated a large log veneer mill, a small log veneer mill, and a stud mill.  These mills were in Lyons, Oregon, about 5 miles from the Walker mills (see par. B-2, below).  They own a trucking company to haul their products.

Before March 1, 1988, petitioner bought 95 to 98 percent of its lumber from public timber sales, primarily from the U.S. Forest Service (Forest Service) and the Bureau of Land Management (BLM). Petitioner also bought timber from the State of Oregon. Before March 1, 1988, petitioner had 10 major competitors for public timber. Petitioner's primary competitors were the Walkers (see par. B, below) and Young & Morgan.

B. <u>The Walker Family and the Walker Business</u>

Until 1988, the Walker family owned and operated two forest product companies in the North Santiam Canyon in Oregon.

1. <u>The Walker Family</u>

References to the Walker family are to Donald Clayton Walker (D.C. Walker), his wife, Mary Walker, and their daughter, Donna Lee Bebout (Bebout). The Walker family competed with the Freres family in the forest products business in North Santiam Canyon. On March 1, 1988, D.C. Walker was 62, Mary Walker was 65, and Bebout was 37. Each member of the Walker family was in good health on March 1, 1988.

a. <u>D.C. Walker</u>

D.C. Walker was born in 1925. He graduated from high school, but had no further formal education. He ran his family's business and made all of the important business decisions. He worked at least 60 hours per week on his family businesses.

In 1959, D.C. Walker and two other people bought a sawmill, moved it to Lyons, Oregon, and formed Cedar Lumber, Inc. (Cedar Lumber). D.C. Walker Enterprises, Inc., an S corporation, bought Cedar Lumber in 1985. D.C. Walker started the Lyons Veneer partnership in 1981. D.C. Walker had good relationships with suppliers and customers. We discuss D.C. Walker Enterprises, Inc., and Lyons Veneer, further at par. B-2, below.

Before March 1, 1988, D.C. Walker had a friendly but competitive relationship with the Freres family. He did not have a social or business relationship with the Freres family after March 1, 1988.

b. <u>Mary Walker</u>

Mary Walker was born in 1922. She went to business school. She first worked as a secretary and bookkeeper. She did estimating for a Ford automobile agency and the U.S. Government. She later did office work for a lumber mill and retail lumber yard. In 1959, she and her family founded Cedar Lumber. She did the office work, including the inventory, payroll, and books for Cedar Lumber. Mary Walker never bid for timber or sold products. She did not routinely work for Lyons Veneer. When she did, she helped with log inventories. By 1985, she had stopped working full time because of her age. She did not do much with her family's businesses after 1985. Mary Walker was not employed in 1994.

c.  Donna Lee Bebout

Bebout was born in 1951.  She worked for Cedar Lumber during the summers when she was in high school.  Before 1978, she worked as a secretary for the owner of Ruble Forest Products in Eugene, Oregon.  She worked part time in the forest products industry when her son Kyle was born.  She began to work for Lyons Veneer in September 1980.  During the 5 years before March 1, 1988, Bebout did the bookkeeping for Lyons Veneer in her home.  She had Lyons Veneer's checkbook.  She did some management or supervisory work for Lyons Veneer.  Lyons Veneer paid her about $3,500 to $4,500 per month.

Bebout was a vice president of D.C. Walker Enterprises, Inc., and was on the board of directors in 1988.  When her father was out of town, Bebout sometimes answered questions about D.C. Walker Enterprises, Inc., and signed papers for the corporation. She also did some clerical work for D.C. Walker Enterprises, Inc.

Bebout had no plans to compete against petitioner even if she had not signed a covenant not to compete.  To compete with petitioner, Bebout would need the help of someone more knowledgeable about the forest products business than she is.

d.  Brent Walker

Brent Walker is the son of D.C. and Mary Walker.  He was estranged from his parents in the 1980's.  Brent Walker operated a company called Thomas Creek Lumber & Logging Co.  He previously

had an interest in the Lyons Veneer partnership (described in par. B-2-b, below) owned by the Walker family. There was litigation between Brent Walker and his parents and sister. A court (not specified in the record) decided that Brent Walker's interest in the Lyons Veneer partnership had terminated in September 1983.

Thomas Creek Lumber & Logging Co. bid on public timber sales but did not own a mill. Brent Walker bought timber and paid subcontractors to harvest it. He sold some logs. He also leased manufacturing time at a veneer plant. He milled lumber at the Brazier Lumber Co. in Molalla, Oregon, into metric sizes for export to Japan.

2. The Walker Entities

Before March 1, 1988, the Walker family owned and operated D.C. Walker Enterprises, Inc., and Lyons Veneer, a partnership, in North Santiam Canyon. We refer to D.C. Walker Enterprises, Inc., and Lyons Veneer as the Walker entities. The Walker entities were in the business of logging, manufacturing veneer and lumber, and related activities. They bought and performed timber contracts. The Walker entities were smaller than the companies with which they competed.

a. D.C. Walker Enterprises, Inc.

D.C. Walker formed D.C. Walker Enterprises, Inc., in 1985. D.C. Walker Enterprises, Inc., bought Cedar Lumber in 1985.

On March 1, 1988, D.C. Walker, Mary Walker, and Bebout each owned one-third of the stock of D.C. Walker Enterprises, Inc.

Before March 1, 1988, D.C. Walker Enterprises, Inc., manufactured forest products. It sold mostly soft white woods to customers in the Orient. It did not sell products in competition with petitioner. Customers from the Orient wanted high-quality lumber cut to precise metric measurements. Petitioner did not have that capability.

### b. Lyons Veneer

D.C. Walker started Lyons Veneer in 1981. On March 1, 1988, Bebout owned 50 percent of Lyons Veneer, and D.C. and Mary Walker owned the other 50 percent. Lyons Veneer competed against petitioner, Willamette Industries, and many others before March 1, 1988. Petitioner, the Walker entities, Young & Morgan, and Frank Lumber were the primary competitors. Before March 1, 1988, Lyons Veneer sold almost all of its finished product to Alpine Veneer. Lyons Veneer did not process soft white woods.

### c. Sources of Timber for the Walker Entities

The Walker entities obtained logs from the Forest Service, BLM, the State of Oregon, and private sources. Most of its logs came from the Forest Service. Lyle Sanders and D.C. Walker managed timber procurement for the Walker entities.

          d.   The Walker Entities' Employees

     D.C. Walker Enterprises, Inc., employed about 40 people
before March 1, 1988.  Lyons Veneer employed 25 to 40 people
before March 1, 1988.  There was no union representation at the
Walker entities before March 1, 1988.

C.   Sale of Public Timber in the North Santiam Canyon Area
     in the Mid to Late 1980's

     Generally, sales of public timber were advertised in
newspapers.  The Forest Service, BLM, and the State of Oregon
usually mailed prospectuses to persons and businesses in the
industry.  Timber offered for sale had a minimum bid price.
Buyers who submitted a sealed bid and submitted a bid bond or a
downpayment could bid at an oral auction.  It was not necessary
to own a sawmill or veneer mill to bid on public timber sales.

     The public agency offering the timber for sale conducted an
oral auction.  The highest bidder from the floor won the oral
auction.  If there were no oral bids, the highest sealed bid won
the auction.

     The Forest Service estimated the number of board feet in a
timber contract.  The winning bidder paid an amount based on the
volume of timber actually harvested.  The volume of timber sold
was normally measured in thousands of board feet (MBF).

     The BLM sold timber on a lump-sum basis.  Buyers bid on an
MBF basis.  The winning bidder applied the BLM volume estimate
and paid a lump sum.

The State of Oregon sold its timber by oral auction until around 1992. Around 1992, the State switched to sealed bids. The State sold timber primarily on a lump-sum basis, and occasionally on a per-unit basis.

D.    North Santiam Canyon Timber Market in the Late 1980's

The forest products industry is cyclical. Timber prices were high and contracts were for long terms in the late 1970's. Prices fell in the early 1980's. From 1983 to 1986 many mills closed because they were saddled with commercially impractical contracts.

Timber costs rose in 1987 and 1988, foretelling increased competition for timber. The Federal Government issued forest plans which stated the amount of timber it intended to harvest each year for 10 years. The draft plans in the late 1980's showed 20 to 25 percent reductions. It was widely known in the industry that the northern spotted owl had been petitioned for listing as an endangered species under the Endangered Species Act of 1973, Pub. L. 93-205, 87 Stat. 884 (current version at 16 U.S.C. secs. 1531-1544 (1994)), late in 1986. Many mills closed in 1987 and early 1988.

In 1984, Congress passed the Timber Contract Payment Modification Act, Pub. L. 98-478, 98 Stat. 2213 (1984), which gave timber companies more time to harvest timber from the old

high price contracts of the late 1970's and the early 1980's before timber prices fell.

E.    Petitioner's Purchase of the Walker Entities' Assets

      1.    Events Leading to the Sale of the Walker Entities' Assets

In 1987, D.C. Walker told Mary Walker that he was getting older and might like to do something else.  At that time, he had no plans for his future, but he was not ready to retire.  In 1987, the Freres family and D.C. Walker discussed a sale of the Walker entities, but did not agree.

In February 1988, D.C. Walker believed that a shortage of logs would cause trouble in the forest products industry in the future.  He believed the industry was beginning to decline and that it would be a good time to sell the Walker entities.

Petitioner wanted to buy the Walker entities at that time. Petitioner wanted to obtain a noncompetition agreement for D.C. Walker from the first time it expressed an interest in buying the Walker entities.  D.C. Walker handled the sale for the Walker entities.  He had a price of $4.65 million in mind.  Petitioner agreed to that price without negotiations.  D.C. Walker did not care how the purchase price was allocated to the various assets and did not negotiate those allocations with petitioner.

      2.    Petitioner's Valuation of Assets

Without involvement by D.C. Walker, petitioner allocated the purchase price to the various assets.  Robert T. Freres, Robert

T. Freres, Jr., and Theodore F. Freres allocated the purchase price for petitioner.

Petitioner carefully calculated the value of Forest Service timber contracts it bought from the Walker family before it agreed to the sale. The fair market value of Forest Service timber contracts that petitioner bought from the Walker entities was $1.5 million on March 1, 1988. Petitioner did not buy other Walker timber contracts that it believed had an excessive contract price. Petitioner used the fair market value of the timber contracts in its allocation.

Before March 1, 1988, petitioner's owners and officers often attended used equipment auctions and regularly reviewed sales brochures for used equipment. They knew the fair market values of used equipment and rolling stock that were similar to the equipment and rolling stock petitioner bought from the Walker family.

Petitioner examined the real property and estimated the value of the land and buildings. A solid waste disposal site was on the premises, and part of the property was contaminated with a toxic chemical.

Robert T. Freres, Jr., told Larry Smith (Smith), Freres' certified public accountant, the final purchase price allocation. Smith then told the Freres' attorney, Richard Miller (Miller). Miller inserted that allocation in the Walker sale agreement.

Neither party to the sale prepared a list of physical assets to be sold.

Petitioner allocated the purchase price to the assets in the Walker sale agreement as follows:

| | |
|---|---|
| D.C. Walker Enterprises, Inc. | |
| Land | $130,000 |
| Buildings and improvements | 120,000 |
| Equipment | 850,000 |
| Rolling stock | 150,000 |
| | |
| Lyons Veneer | |
| Building and improvements | 75,000 |
| Equipment | 250,000 |
| Rolling stock | 75,000 |
| | |
| Covenants not to compete | |
| D.C. Walker | 1,200,000 |
| Mary Walker | 150,000 |
| Donna Lee Bebout | 150,000 |
| | |
| U.S. Forestry Service timber | |
| Sale contracts | 1,500,000 |
| Total | 4,650,000 |

3. Terms of the Agreement

In the Walker sale agreement, petitioner bought most of the assets used by the Walker entities for $4,650,000. Petitioner also bought other log inventories for an additional price. Petitioner did not buy from the Walker entities accounts receivable, cash, notes receivable, the business names of Lyons Veneer and D.C. Walker, the corporate name of D.C. Walker Enterprises, Inc., business records, certain vehicles, and some unprofitable Forest Service timber sale contracts.

4.  Covenants Not To Compete

The Walker family agreed to sign covenants not to compete with petitioner.  The covenants prohibited D.C. Walker, Mary Walker, and Bebout from participating or engaging in the same business as or any business similar to petitioner's within 140 miles of Lyons, Oregon, for 5 years.  The covenants prohibited the Walkers from encouraging any prior employees, suppliers, or customers of Walker entities to curtail or reduce their employment or business dealings with petitioner.

Payments were combined into one payment schedule and promissory note.  If petitioner did not make payments under the agreement, the Walker family would not be bound by the covenant until the price of the covenant was paid in full.

5.  Payment

Petitioner made a downpayment of $1 million and signed a $3,650,000 note secured by a trust deed and Uniform Commercial Code financing statements.  Petitioner made the promissory note payable to D.C. Walker Enterprises, Inc.

6.  Events After the Sale

D.C. Walker had no future plans when he sold the Walker entities.  He went to Washington State to bid on timber.  He also unsuccessfully tried to buy a mill in Olympia, Washington.

Buying the Walker entities' assets helped petitioner to enter the export lumber market.  The Sumitomo Forestry Co.

(Sumitomo) was one of the Walker entities' customers. Sumitomo was not a customer of petitioner before the Walker asset sale, but was after it.

The Walker entities remained obligated to perform the timber contracts that petitioner did not buy from them. After the sale, the Walker entities owed more than $4.65 million to the Government for timber sales. However, the Walker entities could harvest the timber under those timber contracts and sell the logs.

The Walker entities agreed to terminate their employees the day before the sale. Petitioner rehired about one-half of the employees from the Walker entities.

### 7. The Walkers' Tax Court Case for Taxable Year 1988

The Commissioner proposed adjustments to the individual tax returns of D.C. and Mary Walker and Bebout for taxable year 1988. The Commissioner determined that part of the value assigned by each of them to the covenants not to compete should be reallocated to land and going-concern value. Each of them contested the adjustments by petitioning the Tax Court, but later conceded the adjustments in full. They each later filed amended returns to be consistent with the 1988 adjustments. The tax impact of the adjustments was essentially neutral.

F.    Petitioner's Income Tax Returns

Petitioner timely filed its Federal income tax returns for taxable years ending September 30, 1988, 1989, and 1990. Petitioner's allocation of assets on its returns was consistent with its allocation in the written agreement.

OPINION

A.    Fair Market Value of the Covenants Not To Compete on March 1, 1988

1.    Positions of the Parties and Burden of Proof

Respondent determined that the fair market value of the covenants not to compete was $750,000 on March 1, 1988. In an amendment to answer, respondent asserts that the value was $403,000. Petitioner contends that the total value of the three covenants was $1.5 million ($1.2 million for D.C. Walker, $150,000 for Mary Walker, and $150,000 for Bebout) as allocated by petitioner on the sale agreement and reported on its Federal income tax returns. Alternatively, based on petitioner's expert's opinion, petitioner contends that the total value was $1,650,000.

Respondent's determination is presumed to be correct, and petitioner bears the burden of proving that respondent's determination is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Thus, petitioner bears the burden of proving that the covenants are worth more than $750,000.

Respondent bears the burden of proving that the covenants

are worth less than $750,000 because that was the value of the covenants not to compete respondent determined in the notice of deficiency. Rule 142(a).

2. Valuation of Covenants Not To Compete

A taxpayer generally may amortize intangible assets over their useful lives. Sec. 167(a); Citizens & So. Corp. v. Commissioner, 91 T.C. 463, 479 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990). To be amortizable, an intangible asset must have an ascertainable value and a limited useful life, the duration of which can be ascertained with reasonable accuracy. Newark Morning Ledger Co. v. United States, 507 U.S. 546, ___, 113 S. Ct. 1670, 1675, 1676 n.9, 1681-1683 (1993). A covenant not to compete is an intangible asset that has a limited useful life and, therefore, may be amortized over its useful life. Warsaw Photographic Associates, Inc. v. Commissioner, 84 T.C. 21, 48 (1985).

The amount a taxpayer allocates to a covenant not to compete is not always controlling for tax purposes. Lemery v. Commissioner, 52 T.C. 367, 375 (1969), affd. per curiam 451 F.2d 173 (9th Cir. 1971). We strictly scrutinize an allocation if the parties do not have adverse tax interests because adverse tax interests deter allocations which lack economic reality. See Wilkof v. Commissioner, 636 F.2d 1139 (6th Cir. 1981), affg. per curiam T.C. Memo. 1978-496; O'Dell & Co. v. Commissioner, 61 T.C.

461, 468 (1974); Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970); Roschuni v. Commissioner, 29 T.C. 1193, 1202 (1958), affd. per curiam 271 F.2d 267 (5th Cir. 1959); Baird v. Commissioner, 25 T.C. 387, 393 (1955); McDonald v. Commissioner, 28 B.T.A. 64, 66 (1933). A covenant not to compete must have "economic reality"; i.e., some independent basis in fact or business reality so that reasonable persons might bargain for the agreement. Patterson v. Commissioner, 810 F.2d 562, 571 (6th Cir. 1987), affg. T.C. Memo. 1985-53; Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960); O'Dell & Co. v. Commissioner, supra at 467-468.

Courts apply numerous factors in evaluating a covenant not to compete. These include: (a) The seller's (i.e., covenantor's) ability to compete, (b) the seller's intent to compete, (c) the seller's economic resources, (d) the potential damage to the buyer posed by the seller's competition, (e) the seller's business expertise in the industry, (f) the seller's contacts and relationships with customers, suppliers, and others in the business, (g) the buyer's interest in eliminating competition, (h) the duration and geographic scope of the covenant, and (i) the seller's intention to remain in the same area. Kalamazoo Oil Co. v. Commissioner, 693 F.2d 618 (6th Cir. 1982), affg. T.C. Memo. 1981-344; Forward Communications Corp. v. United States, 221 Ct. Cl. 582, 608 F.2d 485, 492 (1979);

Sonnleitner v. Commissioner, 598 F.2d 464, 468 (5th Cir. 1979), affg. T.C. Memo. 1976-249; Fulton Container Co. v. United States, 355 F.2d 319, 325 (9th Cir. 1966); Annabelle Candy Co., Inc. v. Commissioner, 314 F.2d 1, 7-8 (9th Cir. 1962), affg. T.C. Memo. 1961-170; Schulz v. Commissioner, supra; Peterson Machine Tool, Inc. v. Commissioner, 79 T.C. 72, 85 (1982), affd. 54 AFTR 2d 84-5407, 84-2 USTC par. 9885 (10th Cir. 1984); Major v. Commissioner, 76 T.C. 239, 251 (1981); O'Dell & Co. v. Commissioner, supra at 468-469; Rudie v. Commissioner, 49 T.C. 131, 139 (1967); Levinson v. Commissioner, 45 T.C. 380, 389 (1966).

### 3. D.C. Walker's Covenant Not To Compete

D.C. Walker had the experience and ability to compete with petitioner.  He had nearly 30 years of experience in the forest products industry.  He had ably competed with petitioner since 1959.  He substantially contributed to the success of the Walker entities.  D.C. Walker had good contacts and relationships with suppliers and customers.  Robert T. Freres, Jr., credibly testified that petitioner wanted to eliminate D.C. Walker from competition.  He and D.C. Walker testified that competition from D.C. Walker could damage petitioner.  We believe that their testimony is substantially true and is generally supported by the record.  D.C. Walker's covenant was limited to 5 years and to a 140-mile radius around Lyons, Oregon.  We think these limits were

reasonably intended to keep D.C. Walker from competing with petitioner. D.C. Walker intended to and did continue to live and work in North Santiam Canyon. D.C. Walker had financial resources available to compete with petitioner. Petitioner paid the Walker family a $1 million downpayment with petitioner owing them the balance. The Walkers kept some high-cost timber contracts that petitioner believed were money losers. After the sale, the Walker entities owed more to the Government for timber contracts than the purchase price for the Walker assets. However, the Walkers owned the timber in those contracts. Respondent conceded that D.C. Walker's age and health did not impede him from competing.[1] He unsuccessfully bid on timber in Washington State and tried to buy a mill near Olympia, Washington. These facts favor petitioner.

Respondent points to the fact that D.C. Walker told Mary Walker that he was getting older and might want to do something different. He testified that at the time of the Walker asset sale he had no thoughts about what he would do after the sale. He said that he would not retire, and he did not. At the time of trial, he had a partnership with Bebout which operated a construction business and a sand and gravel pit. We conclude

---

[1] Respondent conceded that D.C. Walker was in good health in 1988 even though he had had lung cancer surgery several years before the Walker asset sale.

that the facts favoring petitioner outweigh the facts upon which respondent relies.

### 4. Mary Walker's Covenant Not To Compete

We believe Mary Walker lacked the technical expertise needed to compete with petitioner. She had done office work in the forest products industry for many years, but she had not bid for timber, sold products, or supervised operations. Petitioner's expert, Paul Clausen (Clausen) of Business Valuation Research, Inc., of Portland, Oregon, testified that Mary Walker did not contribute much to the Walker entities. There is no convincing evidence that Mary Walker's competition would damage petitioner, or that she had the kind of business relationships with suppliers and customers that would enable her to compete with petitioner. There is no credible evidence that petitioner had a genuine interest in eliminating Mary Walker as a competitor. In 1988, Mary Walker was no longer doing much with the Walker entities. She did not say that she wanted to compete. There is no convincing evidence that she intended to compete. These factors favor respondent.

Petitioner relies on the facts that in 1988, Mary Walker was 65 and in good health, had financial resources, and had a covenant that was limited to 5 years and to a 140-mile radius around Lyons, Oregon. We think these limits would have reasonably kept Mary Walker from competing with petitioner.

She intended to live in the area. These facts are not enough show that her covenant not to compete had economic reality.

5. <u>Bebout's Covenant Not To Compete</u>

In 1988, Bebout was 37 and in good health. She had worked in the forest products industry for many years. She handled some corporate business when her father was away. She is in a partnership with her father which now runs a construction and gravel business. Her brother entered the forest products business without owning a mill. We believe Bebout could have competed with petitioner if she had been so inclined. Bebout owned the same amount of stock of D.C. Walker Enterprises, Inc., as D.C. and Mary Walker. She owned 50 percent of Lyons Veneer and had financial resources available to her. Bebout's covenant was limited to 5 years and to a 140-mile radius around Lyons, Oregon. We think these limits were reasonably drawn to keep Bebout from competing with petitioner. Bebout intended to remain in the area. These facts favor petitioner.

Bebout's technical knowledge of the forest products industry is not established by the record. Clausen believed it was unlikely that Bebout could compete with petitioner without D.C. Walker's help. Bebout made no statements when the family sold the Walker assets indicating that she intended to compete. Bebout testified that she had good contacts and relationships with suppliers and customers, but could not identify any of them.

There is no evidence that petitioner had a bona fide interest in eliminating Bebout as a competitor. These facts favor respondent.

### 6. Expert Opinions

The parties relied on expert witnesses to prove the value of the covenants not to compete on March 1, 1988. Expert witnesses' opinions can aid the Court in understanding an area requiring specialized training, knowledge, or judgment. However, as the trier of fact, the Court is not bound by the experts' opinions. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938). The opinions of expert witnesses are weighed according to their qualifications and other relevant evidence. Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part T.C. Memo. 1956-178; Johnson v. Commissioner, 85 T.C. 469, 477 (1985).

The testimony of each expert was generally helpful to our overall understanding of the case. However, we believe the testimony of each expert was excessively favorable to the party which called the expert.

### a. Petitioner's Expert

Petitioner relied on Clausen's expert testimony to value the covenants not to compete, goodwill, and going-concern value. Clausen concluded that the three covenants were worth $1,650,000. Clausen used a method based on his estimate of how much

petitioner would save if the Walker entities stopped bidding on public timber. Clausen studied sales by the Forest Service, BLM, and the State of Oregon to quantify how much direct competition there was between the Frereses and Walkers during the 7 years before the Walker asset sale. He found nine sales in which petitioner was the high bidder and Walker was the second high bidder. He assumed that petitioner could have been the high bidder for slightly more than the third high bid for those sales if Walker had not bid. He subtracted the high bid from the third high bid. The difference is the "upbid". In his opinion, the upbid was the cost Walker imposed on petitioner. He calculated that the annual average upbid for the 7-year period was $524,400. He applied that amount to each year from 1981 to 1987. He calculated the total present value of the upbids over the 7 years to be $1,568,277 discounted by 20 percent and $1,757,870 discounted by 15 percent. He averaged those two amounts and concluded that the covenants were worth $1,650,000.

We believe Clausen significantly overstated his conclusion. He assumed that the upbid is the difference between the highest and third highest bid. Clausen did not adequately explain why he subtracted the upbid resulting from two bidders to estimate the effect on the contract price of one bidder. He did not explain why it is reasonable to assume that a bidder could count on beating the third highest bidder by an insignificant amount.

Clausen did not use a weighted average of upbids to calculate the value of the covenants. However, he used weighted averages in other parts of his report. He believed that more weight should be given to recent events in analyzing the forest products industry because the industry was highly cyclical. He weighted earnings as 5 for 1987, 4 for 1986, 3 for 1985, 2 for 1984, and 1 for 1983. Thus, he gave more weight to the years immediately before the sale when he evaluated earnings. On the other hand, Clausen's method of evaluating upbids minimized the bids from the 3 years immediately before the sale, even though, according to Clausen, the earlier years should be given less weight.

Clausen assumed that no other bidder would take the Walkers' place. However, he estimated that Brent Walker cost petitioner $1,169,400 in upbids. This shows that others can cause substantial upbids for petitioner on timber contracts. Clausen listed 10 entities in the North Santiam Canyon that competed for timber. Robert T. Freres, Jr., testified that petitioner's principal competitors for public timber in the North Santiam Canyon area during the 1980's were Cedar Lumber, Lyons Veneer, Young & Morgan, and Frank Lumber. Petitioner also competed, for example, with Avison Lumber, Frasier Lumber, Vanport Manufacturing, Boise Cascade, Willamette Industries, and Bohemia. Clausen did not discuss whether any of these companies would

replace the Walkers in bidding for timber. Clausen testified that whether a bidder drops out depends on each bidder's backlog of stumpage, market for their product, need for the timber, and many other variables.

Clausen believed that there were few bids between petitioner and the Walkers in the 3 years immediately before the Walker asset sale because the Walkers had a large volume of timber contracts remaining from the early 1980's. The Walkers kept timber contracts after the Walker asset sale. Petitioner made clear that one of the reasons for the covenants not to compete was to eliminate the Walkers from bidding for timber. However, Clausen did not explain why the timber contracts that the Walkers kept and the continued decreased bidding activity would not affect the value of the covenants not to compete.

There is no doubt that D.C. Walker affected petitioner's cost for timber; however, we believe Clausen's analysis significantly overstates the value of the covenants not to compete.

### b. Respondent's Expert

Respondent's expert witness was D. Alan Hungate (Hungate) of the First Princeton Corp. in Portland, Oregon. He concluded that Mary Walker's and Bebout's covenants not to compete had no value and that D.C. Walker's covenant was worth $403,000 on March 1, 1988.

Hungate assumed that the fair market value of the covenants not to compete is the sum of the present value of lost cash-flow that would occur if there were no covenants not to compete and tax savings from amortizing the value of the covenants. He computed the lost cash-flow by analyzing the volume of timber available to petitioner. Hungate estimated that petitioner could buy 14 percent more timber with the covenants not to compete. He believed that petitioner's cash-flow would have been cut by about 15 percent if the Walkers could compete. He computed the present value of that amount and divided it by 3 because he believed that there was a one-third chance that D.C. Walker would have competed against petitioner if there had been no covenant. He calculated the tax savings and added that amount to the lost cash-flow total. He concluded that the covenants not to compete had a fair market value of $403,000 on March 1, 1988.

We have very little confidence in Hungate's value of the covenants not to compete. We are not convinced that there was only a one-third chance that D.C. Walker would compete without a covenant not to compete. Hungate ignored significant facts. One of the primary reasons that petitioner wanted the covenants not to compete was to eliminate the Walkers from bidding on timber. Hungate ignored this fact. On several occasions, D.C. Walker bid a Forest Service sale to an inflated level, then dropped out, leaving petitioner to buy the timber at a higher price. Hungate

conceded that his method could not account for this situation because he only analyzed available timber volume and not the prices of timber. The Walkers competed with the three mills that petitioner owned. Hungate ignored this fact and only measured the cash-flow of the two mills that petitioner bought from the Walkers. Hungate testified that petitioner and the Walkers bought timber from the Forest Service, BLM, and the State of Oregon. Hungate ignored timber sales from BLM and the State of Oregon.

Hungate evaluated the volume or market share of timber. To select a dollar value, he assumed that the available volume of timber had a direct relationship with cash-flow. He assumed that each percentage increase of available volume of timber resulted in about the same percentage increase in cash-flow. He did not support that assumption. Hungate testified that the Court should use caution in relying on his method. He admitted that it is very difficult to analyze the direct relationship between the volume of timber and cash-flow because many factors affect cash-flow. However, he did not explain those factors. We also disagree with Hungate's conclusion that Bebout's covenant not to compete had no value. We do not find Hungate's estimates of the value of the covenants not to compete to be very convincing.

7.    Conclusion About the Value of the Covenants Not
      To Compete

We conclude that D.C. Walker's covenant not to compete had a fair market value of $900,000 on March 1, 1988.  Because Mary Walker had less experience in the timber industry and no stated intent to compete and posed no credible threat to petitioners, we conclude that the fair market value of her covenant not to compete was zero on March 1, 1988.  While Bebout lacked experience in certain aspects of the timber industry, we think her knowledge, the fact that her brother competed effectively, and her subsequent work history show that her covenant had some value, which we conclude was $30,000.

B.    Fair Market Value of Land

Petitioner reported that the fair market value of the land belonging to the Walker entities was $130,000 on March 1, 1988.  Respondent determined that the fair market value was $200,000.

The land consisted of the mill site and ancillary land.  The mill site was the 35-acre area surrounding the mills.  The rest of the land (about 93.5 acres) was ancillary land.  Darr Goss (Goss), petitioner's expert real property appraiser, concluded that the land was worth $145,000 based on six sales of land comparable to the mill site and five sales of land comparable to the ancillary land.  Respondent did not cross-examine Goss or offer any evidence about the fair market value of the land.

Respondent contends that Goss' sale 1 was not comparable because it had a log pond, unlike the Walker's mill site. Petitioner contends that the log pond served the same purpose as the log deck for the Walker mill site. Even if respondent is correct about the log pond, respondent does not criticize Goss' sales 2, 3, or 4.

Respondent contends that the sale 5 site is not comparable to the Walker site because the sale 5 site had potential environmental cleanup problems. Respondent alleges that the sale 5 mill site occupied only one-fifth of the land that was sold. We disagree. The Walker mill site had similar environmental problems. Respondent did not include the log deck area in computing the sale 5 mill-site area. We believe the sale 5 site is comparable to the Walker mill site. Respondent contends that the sale 6 site is not comparable to the Walker site because the sale 6 site was zoned for industrial and agricultural use. We disagree. Goss reasonably concludes in his report that the highest and best use of the Walker site was industrial and agricultural.

Respondent contends that Goss should increase his estimate of the value of the ancillary land because the land includes a solid waste disposal site. We disagree. The solid waste disposal site had little value because a permit to establish such a site was inexpensive and easy to obtain. The site may contain

substances which could decrease its value.  We believe this is quite possible because other parts of the property had been contaminated with pentachlorophenol.

Respondent criticizes Goss' conclusion that the highest and best use of the ancillary land was agricultural development and points out that it was zoned for industrial use.  We find Goss' opinion that development of the entire site is unlikely because part of it is zoned for farm/forest use to be reasonable. Respondent offered no contrary evidence.

Respondent criticizes Goss for failing to consider the potential for planting timber on the ancillary land.  However, Goss did just that in discussing the use and zoning of the land.

We conclude that the fair market value of the land on March 1, 1988, was $145,000.

C.   Allocation for Goodwill or Going-Concern Value

   1.   Section 1060 and the Parties' Contentions

The parties agree that section 1060 applies to the Walker asset sale.  Under section 1060, assets are divided into four classes:  Class I (cash and demand deposits), class II (certificates of deposit, Federal securities, readily marketable stock and securities, and foreign currency), class III (includes accounts receivable, equipment, buildings, land, and covenants not to compete), and class IV (goodwill and going-concern value). Sec. 1.1060-1T(a)(1), (b)(1), (d), Temporary Income Tax Regs., 53

Fed. Reg. 27039-27040 (July 18, 1988).  The total consideration is allocated to class I assets in an amount equal to each asset's face value.  The remaining consideration is then allocated to class II assets in proportion to the fair market value of each class II asset.  The remaining consideration is then allocated to class III assets in an amount equal to the fair market value of each class III asset.  Any residue is allocated to class IV. Sec. 1.1060-1T(d), Temporary Income Tax Regs., supra.

Petitioner argues that no value should be allocated to class IV because the value of class III assets exceeds the sale price. Respondent determined that the sale price exceeded the value of the class III assets by $680,000 on March 1, 1988.  Respondent contends that the sale price exceeded the value of class III assets by $1,027,000.

The parties agree that the value of the timber contracts was $1.5 million on March 1, 1988.  We have decided that the values of the land and covenants not to compete were $145,000 and $930,000, respectively.  Petitioner contends that the fair market values of building and improvements, equipment, and rolling stock were as provided in the reports of its expert witnesses.  The following chart shows the parties' positions relating to the allocation for all assets:

Class III Assets

| D.C. Walker Enterprises, Inc. | Petitioner's Purchase Agreement and Return | Petitioner's Brief | Respondent's Determination | Respondent's Brief |
|---|---|---|---|---|
| Land | $130,000 | $145,000 | $200,000 | $200,000 |
| Buildings and improvements | 120,000 | 246,000 | 120,000 | 120,000 |
| Equipment | 850,000 | 1,000,000 | 850,000 | 850,000 |
| Rolling stock | 150,000 | 200,000 | 150,000 | 150,000 |
| Lyons Veneer | | | | |
| Buildings and improvements | 75,000 | 138,608 | 75,000 | 75,000 |
| Equipment | 250,000 | 500,000 | 250,000 | 250,000 |
| Rolling stock | 75,000 | 90,000 | 75,000 | 75,000 |
| Covenants not to compete | | | | |
| D.C. Walker | 1,200,000 | 1,650,000 | 750,000 | 403,000 |
| Mary Walker | 150,000 | | | - 0 - |
| Donna Lee Bebout | 150,000 | | | - 0 - |
| U.S. Forest Service timber | | | | |
| Sale contracts | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 |
| Total Class III | 4,650,000 | 5,469,608 | 3,970,000 | 3,623,000 |
| Class IV Assets | | | | |
| Goodwill/going-concern value | - 0 - | - 0 - | 680,000 | 1,027,000 |

## 2. Petitioner's Evidence of the Value of Buildings and Improvements, Equipment, and Rolling Stock

Petitioner introduced into evidence expert reports with valuations of buildings and improvements, equipment, and rolling stock which differ from those contained in the purchase agreement and petitioner's tax return. Respondent contends that we must apply the rule in Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), or alternatively, the strong proof rule.

a.   The Danielson Rule

In Danielson, the Court of Appeals for the Third Circuit held that a party to a contract allocating part of the purchase price to a covenant not to compete can challenge the tax consequences of that agreement only by presenting proof which would be admissible in an action between the parties to the agreement to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, or duress.  Commissioner v. Danielson, supra at 775.  Not all Courts of Appeals have adopted the Danielson rule.  We do not apply it unless the Court of Appeals to which a case could be appealed has adopted it.  Elrod v. Commissioner, 87 T.C. 1046, 1065-1066 (1986); Coleman v. Commissioner, 87 T.C. 178, 202 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987); Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).  This case is appealable to the Court of Appeals for the Ninth Circuit.  That Court of Appeals has not adopted the Danielson rule.[2]  Therefore, we do not apply it in cases appealable to that Court of Appeals.

_____

[2] The Court of Appeals for the Ninth Circuit cited Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), revg. and remanding 44 T.C. 549 (1965), in Throndson v. Commissioner, 457 F.2d 1022, 1025 (9th Cir. 1972), affg. Schmitz v. Commissioner, 51 T.C. 306 (1968).  In Throndson, the Court of Appeals did not decide whether the Danielson rule applied because there was no binding contract, which is required to apply the Danielson rule.

b. The Strong Proof Rule

Alternatively, respondent contends that the strong proof rule applies here. Ullman v. Commissioner, 264 F.2d 305, 308 (2d Cir. 1959); Meredith Corp. & Subs. v. Commissioner, 102 T.C. 406, 438 (1994); Elrod v. Commissioner, supra at 1066; Coleman v. Commissioner, supra at 202 & n.17; G C Servs. Corp. v. Commissioner, 73 T.C. 406, 412 (1979). In Ullman, the Court of Appeals for the Second Circuit held that a taxpayer-buyer had to produce strong proof to overcome allocations of value in an agreement it negotiated with a seller which had an adverse tax position. In Ullman, the Court of Appeals said that tax adversity forces most buyers and sellers to use realistic values when they allocate the purchase price in an agreement. Ullman v. Commissioner, supra at 308; see Schulz v. Commissioner, 294 F.2d at 55 ("Generally speaking, the countervailing tax considerations upon each taxpayer should tend to limit schemes or forms which have no basis in economic fact."); UMCO Corp. v. Commissioner, T.C. Memo. 1973-218 (conflicting tax interests are a prerequisite to applying the strong proof rule). The rationale for the strong proof rule does not apply here because the seller did not care about and the parties did not negotiate the allocations; Schulz v. Commissioner, supra, Ullman v. Commissioner, supra. Respondent has given no reason for it to apply beyond the

context in which it was created.  We are inclined not to expand it without a supporting rationale.

### c.   Weighing the Evidence

The evidence of the value of the buildings and improvements, equipment, and rolling stock consists of the opinions of petitioner's experts and the amounts in the written agreement. Donald Gwyther (Gwyther) prepared an expert report on the value of the equipment and rolling stock.  Goss prepared an expert report on the value of the buildings and improvements. Respondent did not dispute either Gwyther's or Goss' expertise. We admitted their reports as exhibits attached to the stipulation of facts.  Respondent speculates that some of Gwyther's data may be inaccurate.  However, respondent did not cross-examine Gwyther or offer any evidence in response to his report.  We believe Gwyther's and Goss' reports to be credible.

Respondent contends that the contract allocation establishes the value of the buildings and improvements, equipment, and rolling stock.  We disagree.  We view the allocations in the written agreement and on petitioner's income tax return as evidence of the value of the disputed items analogous to an admission under rule 801(d)(2) of the Federal Rules of Evidence, which petitioner can overcome with cogent evidence.  See Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. T.C. Memo. 1968-126.  The contract allocation was unilateral and made

without an expert appraisal.  Cf. <u>Mooneyham v. Commissioner</u>, T.C. Memo. 1991-178.  The record does not show how the Freres family chose the amounts they used in the agreement.  We believe Gwyther's and Goss' opinions of value are entitled to considerably more weight than the opinions of the members of the Freres family.  We conclude that petitioner is entitled to prevail on the allocations for buildings and improvements, equipment, and rolling stock, even if a strong proof standard applies.

We conclude that the proper allocations of value under section 1060 for the class III assets are $384,608 for buildings and improvements, $1.5 million for equipment, and $290,000 for rolling stock.

    3.    <u>Calculation of Goodwill and Going-Concern Value Under Section 1060</u>

Petitioner paid $4.65 million for the Walker assets.  To allocate the purchase price to assets under section 1060, we subtract from that amount the following values for class III assets:

<u>D.C. Walker Enterprises, Inc.</u>

| | |
|---|---|
| Land | $145,000 |
| Buildings and improvements | 246,000 |
| Equipment | 1,000,000 |
| Rolling stock | 200,000 |

<u>Lyons Veneer</u>

| | |
|---|---|
| Buildings and improvements | 138,608 |
| Equipment | 500,000 |
| Rolling stock | 90,000 |

Covenants Not To Compete
    D.C. Walker                         900,000
    Mary Walker                       - 0 -
    Donna Lee                        30,000

U.S. Forest Service Timber
    Sale contracts                1,500,000

    Total class III assets    4,749,608

We allocate the consideration received in the Walker sale under section 1060 as follows:

1.   Consideration received for purchase of assets   $4,650,000

2.   Allocation to class I and II               - 0 -

3.   Allocation to class III

   a.   Amount available to allocate to class III   4,650,000
   b.   Class III assets                      4,749,608

4.   Allocation to class IV

   a.   Amount available to allocate to class IV
       is goodwill and going-concern value      - 0 -

To reflect concessions by the parties and the foregoing,

Decision will be

entered under Rule 155.